**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 1 1 2008 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 07-CR-906 |
| | ) | |
| v. | ) | MEMORANDUM & ORDER |
| | ) | |
| RAMEL HANDY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Appearances:**

**For United States of America:**

      Benton J. Campbell, United States Attorney
         By:    Brian Meagher, Assistant United States Attorney

**For Defendant Ramel Handy:**

      Federal Defenders of New York, Inc.
         By:    Michael K. Schneider

**JACK B. WEINSTEIN, Senior United States District Judge:**

**Table of Contents**

I. Introduction ...................................................................................................................4

II. Facts.........................................................................................................................6

    A. Crime ...................................................................................................................6

    B. Presentence Report Guideline Calculations ........................................................7

    C. Sentencing Hearings ............................................................................................7

III. Sentencing Guidelines ...............................................................................................10

    A. Pre-*Booker* ........................................................................................................10

    B. Post-*Booker* ......................................................................................................18

    C. Correct Calculation of the Guidelines Required.................................................23

IV. Enhancement for Stolen Gun......................................................................................25

    A. Guideline ...........................................................................................................25

    B. Appellate Review ..............................................................................................26

        1. Court of Appeals for the Second Circuit ....................................................26

        2. Court of Appeals for the Third Circuit .......................................................28

        3. Court of Appeals for the Ninth Circuit.......................................................34

        4. Courts of Appeals for the Fourth, Fifth, Sixth, Eighth, Tenth, Eleventh, and District

           of Columbia Circuits ................................................................................37

    C. Reconsideration Under the Sixth Amendment Line of Cases ...........................38

        1. Developing Sixth Amendment Defendants' Protections in Sentencing......................39

        2. Loss of Force in Enhancement Precedents .................................................43

    D. Invalidity............................................................................................................44

1. General Problems in Reviewing the Sentencing Commission's Determinations........44

    a. Administrative Law Framework...........................................................................44

    b. Review of Commentary.......................................................................................47

    c. Departure from the Guidelines ...........................................................................53

2. Commentary to U.S.S.G. § 2K2.1(b)(4) Violating Enabling Statute ..........................53

    a. Standard of Review .............................................................................................53

    b. Enhancement Violates Requirement of Knowledge that Firearm was Stolen.......60

       i. Statute Requiring Mens Rea............................................................................60

      ii. Historical Importance and Constitutional Requirement of Mens Rea.............63

      iii. Analysis ........................................................................................................67

V. Conclusion...................................................................................................................71

## I.    Introduction

The powers of a democratic constitutional government such as ours to punish people must be exercised rationally. Arbitrary and capricious punishment is not acceptable. See generally Furman v. Georgia, 408 U.S. 238 (1972). The requirement of mens rea is a central organizing principle and requirement of our criminal law. The United States Sentencing Commission is bound by these fundamental rules.

The problem now posed is: whether the Commentary to the United States Sentencing Guidelines—designed to be followed by sentencing courts—may provide for enhanced punishment of a felon in possession of a stolen handgun if the criminal does not know that it was stolen? The answer is: such a rule, devoid of any mens rea connection, is irrational, is inconsistent with the Constitution and criminal laws of the United States, and is void.

To add many months of incarceration for possession of a gun because the gun was stolen, when the defendant did not and could not know it was stolen, is to punish by lottery. Haphazard chance is not a guiding spirit of our rule of law. Nor is the present method of adopting, reviewing and applying Commentaries such as the one now in question satisfactory as a matter of administrative law. See infra section IV.D.1.b.; cf. 28 U.S.C. §§ 2071-2077 (methods of adoption for rules of courts with public and congressional participation).

This court's present ruling is contrary to courts of appeals decisions in this and other circuits. Nevertheless, in sentencing the Supreme Court has recognized the primacy of the district court's responsibility. Nisi prius power includes the obligation to declare invalid a Guideline or Sentencing Commission Commentary interpreting the Guideline if it is void for unconstitutionality or if it exceeds the Commission's power to adopt it.

4

The federal statute defendant here pled guilty to criminalizes possession of firearms by convicted felons. See 18 U.S.C. § 922(g)(1). The Sentencing Commission mandates a two-level enhancement to the offense level of a defendant charged with this offense if the firearm was stolen. See U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2K2.1(b)(4). Pursuant to the Guideline Commentary, defendant's lack of knowledge that the firearm was stolen is irrelevant; strict liability applies. See U.S.S.G. § 2K2.1 cmt. n.8(B).

Sentencing judges must give the same weight to this Commentary as they give to the Guidelines themselves. See United States v. LaBonte, 520 U.S. 751 (1997); U.S.S.G. § 1B1.7. The fact that the Guidelines no longer mandatorily control the sentence has not eliminated them as a critical factor that must be considered in fashioning a sentence. See 18 U.S.C. § 3553(a)(4)(A); United States v. Sanchez, 517 F.3d 651, 661 (2d Cir. 2008). If a Commentary is invalid it must be stricken in the same way as would be an invalid Guideline. LaBonte, 520 U.S. at 753.

In the present case the enhancement Commentary for a stolen gun, not known to have been stolen by defendant, would change the Guidelines range applicable to this defendant from 37 to 46 months to 46 to 57 months. That enhancement represents a 24.3% increase in the bottom and a 23.9% increase in the top end of the applicable Guideline range. Imposition of such an enhancement predicated upon an irrational finding by the Commission would be illegal.

The arbitrary and capricious nature of the Commission's exclusion of mens rea from its two-level enhancement is particularly egregious since it violates congressional policy. In contrast to the Commission's rule, an analogous federal statute criminalizes possession of a stolen firearm only if the person knows or has reasonable cause to believe that the firearm was stolen. See 18 U.S.C. § 922(j). The two-level Guidelines enhancement obviously cannot apply

to a conviction under this statute. See U.S.S.G. § 2K2.1 cmt. n.8(A). It applies to this defendant under the Guidelines because, anomalously, he was convicted under another section dealing with possession of a firearm—18 U.S.C. § 922(g)(1)—that contains no element relating to the thievery of the weapon. Deemed irrelevant under the Commentary is the fact that this defendant did not know and had no reasonable cause to believe that the firearm he possessed was stolen.

The same due process requirement for legislative enactments that conduct without culpable mens rea cannot be criminalized except for minor strict liability crimes, is applicable to the work of the Sentencing Commission. Consistent with fundamental legal tradition that blameworthiness hinges upon a culpable state of mind, the defendant's Guideline calculation must be predicated upon culpability. See, e.g., United States v. Polizzi, 549 F. Supp. 2d 308, 349-53 (E.D.N.Y. 2008) (citing authorities on mens rea); United States v. Cordoba-Hincapie, 825 F. Supp. 485, 489-527 (E.D.N.Y. 1993) (same). Thus, the Commentary to section 2K2.1(b)(4) of the Sentencing Guidelines is invalid.

## II.    Facts

### A.    Crime

On November 30, 2007 when Ramel Handy was twenty years old, having spent the better part of his adolescence in prison, he was observed by two uniformed police officers. See Presentence Report dated Apr. 7, 2008 ("PSR") ¶ 2. He and another individual were standing on a pedestrian pathway at a public housing complex in the Brownsville section of Brooklyn. Id. Handy adjusted an object concealed in the rear waistband of his pants. Id. He was approached by the officers and asked for identification. Id. Responding that he had none, he was told that he would be subjected to a "pat-down" search for weapons. Id. He ran from the officers through the housing complex, tossing a loaded pistol onto a grassy area on the sidewalk as he went. Id. He was captured immediately and placed under arrest. Id. ¶¶ 2-3.

6

In post-arrest statements he admitted that he "took" the gun from an acquaintance earlier in the day. Id. Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") determined that the firearm, a Hi-Point nine-millimeter semi-automatic pistol, was manufactured outside of New York State and had been reported stolen in Fulton County, Georgia in 2006. Id. ¶ 1 (type of firearm); id. ¶ 4 (place of manufacture); id. ¶ 5 (reported stolen in Georgia).

On February 14, 2008, Handy pled guilty to a single-count indictment charging him with possession of a firearm after having previously been convicted of a felony. See 18 U.S.C. §§ 922(g)(1) and 924(a)(2). As already noted, this statute does not incorporate the element of the firearm having been stolen.

### B.   Presentence Report Guideline Calculations

The probation department calculated the base offense level at twenty. PSR ¶ 9; see also U.S.S.G. § 2K2.1(a)(4)(A) (calculating the base offense level for unlawful possession of a firearm at 20 if "the defendant committed . . . offense subsequent to sustaining one felony conviction of . . . a crime of violence . . . "). Over the defendant's objection, a two-level enhancement was applied because the firearm had been stolen. PSR ¶ 9; Addendum to PSR dated Apr. 25, 2008; see also U.S.S.G. § 2K2.1(b)(4) ("If any firearm (A) was stolen, increase by 2 levels . . ."); id. § 2K2.1 cmt. n.8(B) (the two-level enhancement "applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen . . .").

### C.   Sentencing Hearings

At the sentencing hearing defendant objected to the two-level enhancement under U.S.S.G. § 2K2.1(b)(4) on the ground that he did not know and had no reason to know that the gun was stolen:

> [I] believe that with the recent revolution in sentencing and the [S]upreme [C]ourt cases, including the recent case about crack cocaine, that it's clear that

this court can make its own decision about whether to apply an enhancement that perhaps was ill-considered by the Guidelines.

My argument is that an enhancement for a circumstance which Mr. Handy had no knowledge about and the government—I think Probation concedes that they have no information that he knew this gun was stolen, and we clearly don't think he went to Georgia and stole it—that that was an ill-considered enhancement by the [Sentencing] Commission.

It is a crime to possess a stolen firearm but that crime requires knowledge. The [Sentencing] Commission, for whatever reason, they decided not to follow Congress'[s] view when they wrote a statute that said possessing a stolen firearm is a crime only if you knew or had reason to know it was stolen. Also, I think the [Sentencing] Commission has ignored hundreds of years of common law, which clearly indicate[s] that knowledge and intent are . . . the touchstones of criminal liability.

Transcript of April 30, 2008 Sentencing Hearing ("Tr. Sent. Apr. 30") at 6-7. Defendant offered

as a second ground for objecting to the enhancement, fairness, based on the fact that

enhancement for a stolen gun had not entered into guilty plea considerations:

[F]undamental fairness requires that the two level enhancement for a stolen firearm should not be applied to this case. The government entered into a plea agreement with Mr. Handy, in which they anticipated no stolen firearm enhancement. This [c]ourt is required to construe plea agreements strictly against the government and to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness. In this case, fairness requires that an enhancement unanticipated in the plea agreement cannot be applied, especially when the facts allegedly supporting the enhancement were known to the government when the plea agreement was executed.

Letter dated Apr. 22, 2008 at 3.

Sentencing was adjourned and briefing on the stolen gun enhancement issue was directed

by the court. Tr. Sent. Apr. 30 at 9. By letter-brief dated May 23, 2008, the government argued

that the two-level enhancement does not violate the due process clause. See Government's

Letter dated May 23, 2008.

At the May 27, 2008 sentencing hearing, Handy conceded that the firearm had been

stolen, but objected to the two-level enhancement because he did not know it was stolen:

| The Court: | So you are conceding it was a stolen gun? |
|---|---|
| [Defense Counsel]: | That's correct. . . . |
| The Court: | Now, to his knowledge that it was stolen, are you conceding that he knew it was stolen? |
| [Defense Counsel]: | Absolutely not. |

Transcript of May 27, 2008 Sentencing Hearing at 10-11. After opportunity was given to the

parties to provide evidence of whether Handy knew that the firearm was stolen, the court

found—and the government conceded—that the defendant did not know that the firearm was

stolen when he initially obtained it or while it was in his possession:

| The Court: | Do you want to put on any evidence of the fact that he didn't know that it was stolen? |
|---|---|
| [Defense Counsel]: | I will ask Mr. Handy. |
| The Court: | He's under oath. . . . |
| [Defense Counsel]: | Mr. Handy, when you came in possession of this gun, how long before you were arrested did you receive the gun? |
| The Defendant: | Couple of hours. |
| [Defense Counsel]: | . . . And when you had the gun in your possession, did you know it had been stolen previously? |
| The Defendant: | No. |
| [Defense Counsel]: | And had you stolen it from anyone previously? |
| The Defendant: | No. |
| The Court: | [Government, do y]ou want to inquire? |
| [Government]: | No. |
| The Court: | . . . I find as a matter of fact that [the] gun was stolen. That it then moved in interstate commerce. That it was obtained by the defendant, but that he did not know it was stolen |

9

|  | when he obtained it, or while it was in his possession. Correct? |
|---|---|
| [Government]: | Yes. |
| [Defense Counsel]: | Yes. |
| The Court: | I find all of that by a preponderance of the evidence. |

Id. at 11-12.

## III.    Sentencing Guidelines

### A.    *Pre*-Booker

In 1984, Congress passed the Sentencing Reform Act and created the United States Sentencing Commission to help deal with uncertainties and disparities in the federal criminal justice system. See Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (1984) (codified as amended at 18 U.S.C. §§ 3551-3742, 28 U.S.C. §§ 991-98); see also, e.g., S. Rep. No. 98-225, at 36 ("[T]he present practices of the federal courts and of the parole commission clearly indicate that sentencing in the federal courts is characterized by unwarranted disparity and by uncertainty about the length of time offenders will service in prison."); Kenneth R. Feinberg, Federal Criminal Sentencing Reform: Congress and the United States Sentencing Commission, 28 Wake Forest L. Rev. 291, 295 (1993) ("The first and foremost goal of the sentencing reform effort was to alleviate the perceived problem of federal criminal sentencing disparity."); Marvin E. Frankel & Leonard Orland, Sentencing Commissions and Guidelines, 73 Geo L. J. 225, 247 (1984).

Section 991 of title 28 of the United States Code established the Sentencing Commission and set forth its purpose "as an independent commission in the judicial branch of the United States." 28 U.S.C. § 991(a). The Commission was charged with the following purposes:

(1) establish sentencing policies and practices for the Federal criminal justice system that--

(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code;

(B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and

(C) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process; and

(2) develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code.

28 U.S.C. § 991(b).

The four main goals of the Commission were: "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed . . . correctional treatment." 18 U.S.C. § 3553(a)(2).

Section 994 of title 18 sets out the specific duties of the Commission and directs it to formulate Sentencing Guidelines and general Policy Statements "consistent with all pertinent provisions of any Federal statute." 28 U.S.C. § 994(a) (emphasis added); see also infra section IV.D.2.b.i. The Commission is obligated to "review and revise" Sentencing Guidelines periodically, 28 U.S.C. § 994(o), to "consult with authorities on . . . various aspects of the Federal criminal justice system," id., to make recommendations to Congress on whether the grades or maximum penalties should be modified, id. § 994(r), to submit to Congress an analysis of the operation of the Guidelines, id. § 994(w), and to issue "general policy statements" regarding their application, id. § 994(a)(2).

Parallel with the Commission's duties to consider "the need for the sentence imposed" to achieve the general purposes of sentencing under 18 U.S.C. § 3553(a)(2), see 28 U.S.C. § 991(b)(1)(A), sentencing courts were mandated to consider seven factors when imposing a sentence. 18 U.S.C. § 3553(a). First, is a broad command to consider the "nature and circumstances of the offense and the history and characteristics of the defendants." 18 U.S.C. § 3553(a)(1). Second, is "the need for the sentence imposed." 18 U.S.C. § 3553(a)(2). Third pertains to "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). Fourth, is the requirement to utilize the Sentencing Guidelines. 18 U.S.C. § 3553(a)(4). Fifth, is the injunction to follow the relevant Policy Statements issued by the Sentencing Commission. 18 U.S.C. § 3553(a)(5). Sixth is to the "need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(6). Seventh is "the need to provide restitution to any victim. 18 U.S.C. § 3553 (a)(7). Preceding this list is a general directive to the sentencing court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Section 3553(a) of title 18 is the courts' basic guide. It reads:

(a) Factors to be considered in imposing a sentence. --The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

- (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

- (2) the need for the sentence imposed—

     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B) to afford adequate deterrence to criminal conduct;

     (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); . . .

. . . .

(5) any pertinent policy statement [issued by the Sentencing Commission]

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. 3553(a) (emphasis added).

In devising the Guidelines, the Commission sought to meet the practical problems in developing a coherent sentencing system, partly by ignoring sentencing theory, policy and the history of sentencing in the United States. See U.S.S.G. § 1A1.3 ("The Basic Approach"). C.f. Christopher Wimmer et al., Sentencing in the United States, in Re-entry Planning for Offenders with Mental Disorders: Policy and Practice (Henry A. Dlugacz, ed., forthcoming 2009). The Commission took "an empirical approach that used as its starting point data estimating pre-guidelines sentencing practice." See U.S.S.G. § 1A1.3. It explained that this:

[E]mpirical approach . . . helped resolve its philosophical dilemma. Those who adhere to a just deserts philosophy may concede that the lack of consensus might

13

make it difficult to say exactly what punishment is deserved for a particular crime. Likewise, those who subscribe to a philosophy of crime control may acknowledge that the lack of sufficient data might make it difficult to determine exactly the punishment that will best prevent that crime. Both groups might therefore recognize the wisdom of looking to those distinctions that judges and legislators have, in fact, made over the course of time. These established distinctions are ones that the community believes, or has found over time, to be important from either a just deserts or crime control perspective.

Id.

In calculating a Guidelines sentence, a sentencing judge would find it difficult to take account of all the section 3553(a)(2) factors. See generally Kevin Cole, The Empty Idea of Sentencing Disparity, 91 Nw. U. L. Rev. 1336, 1336-37 (1997). The Sentencing Commission failed to develop a method by which all section 3553(a)(2) factors should be combined in application.

A philosophical problem arose when the Commission attempted to reconcile the differing perceptions of the purposes of criminal punishment. Most observers of the criminal law agree that the ultimate aim of the law itself, and of punishment in particular, is the control of crime. Beyond this point, however, the consensus seems to break down. Some argue that appropriate punishment should be defined primarily on the basis of the moral principle of 'just deserts.' . . . Others argue that punishment should be imposed primarily on the basis of practical 'crime control' considerations. . . .

Adherents of these points of view have urged the Commission to choose between them, to accord one primacy over the other. Such a choice would be profoundly difficult. The relevant literature is vast, the arguments deep, and each point of view has much to be said in its favor. A clear-cut Commission decision in favor of one of these approaches would diminish the chance that the guidelines would find the widespread acceptance they need for effective implementation.

U.S.S.G. § 1A1.1, pt. A(3) ("The Basic Approach"); see also United States v. Blake, 89 F. Supp. 2d 328, 340-46 (E.D.N.Y. 2000) (discussing the rehabilitative model); United States v. Blarek, 7 F. Supp. 2d 192, 198-204 (E.D.N.Y. 1992) (discussing section 3553(a) and traditional sentencing rationales). The Commission avoided the "philosophical problem" by "taking an empirical

approach" and using averages of prior sentencing decisions to derive Guideline ranges for most offenses:

> Despite these policy-oriented departures from present practice, the guidelines represent an approach that begins with, and builds upon, empirical data. The guidelines will not please those who wish the Commission to adopt a single philosophical theory and then work deductively to establish a simple and perfect set of categorizations and distinctions. . . . After spending considerable time and resources exploring alternative approaches, the Commission has developed these guidelines as a practical effort toward the achievement of a more honest, uniform, equitable, and therefore effective, sentencing system.

U.S.S.G. § 1A1.1, pt. A(3); see also Marvin E. Frankel, Sentencing Guidelines: A Need for a Creative Collaboration, 101 Yale L.J. 2043, 2047 (1992) ("The Commissioners took up the direction to look at prior average sentences 'as a starting point,' but not to be bound by them. That meant starting with a tradition of criminal sanctions that ranks next to the American states as the harshest in the Western world. Then, instead of mitigating, as I think a rational and courageous stance should have dictated under the power to formulate guidelines 'consistent with the purposes of sentencing described in section 3553(a)(2) of title 18,' the Commission produced guidelines that actually increase the overall severity . . .") (footnotes omitted).

A departure from the Guidelines was permitted only if the sentencing court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); Koon v. United States, 518 U.S. 81, 92-96 (1996) (recognizing the importance of district court discretion to identify those cases that did not fall within the "heartland" of the Guidelines); United States v. Merritt, 988 F.2d 1298, 1311 (2d Cir. 1993) ("consideration of a factor by the Commission does not bar departure"); see also, e.g., United States v. Hawkins, 380 F. Supp. 2d 143 (E.D.N.Y. 2005) (granting downward departure on basis of extraordinary rehabilitation); United States v.

Patterson, 281 F. Supp. 2d 626 (E.D.N.Y. 2003) (aberrant behavior); United States v. Liu, 267 F. Supp. 2d 371 (E.D.N.Y. 2003) (significantly reduced mental capacity); United States v. Blake, 89 F. Supp. 2d 328 (E.D.N.Y. 2000) (significantly reduced mental capacity, aberrant behavior, anticipated trauma to defendant's infant child if separated from mother, and rehabilitation); United States v. Blarek, 7 F. Supp. 2d 192 (E.D.N.Y. 1998) (vulnerability in prison and HIV-positive status); United States v. Malpeso, 943 F. Supp. 254 (E.D.N.Y. 1996) (family circumstances); United States v. Ferranti, 928 F. Supp. 206 (E.D.N.Y. 1996) (departing upward to increase fine, imposing costs of imprisonment, and ordering restitution in prosecution of wealthy landlord who burned an occupied building to collect on insurance policy, resulting in death of a firefighter); United States v. Tropiano, 898 F. Supp. 90 (E.D.N.Y. 1995) (departing upwards where benign nature of convicted offense belied actual extent of criminal enterprise and Guidelines under-represented true criminal history); Note, A Trial Judge's Reflections on Departures from the Federal Sentencing Guidelines, 5 Fed. Sent. Rep. 6 (1992).

Congressional delegation of authority to the Commission survived delegation of power and separation of powers challenges. See Mistretta v. United States, 488 U.S. 361 (1989). The Supreme Court held that congressional delegation of authority to the Commission was proper because the Sentencing Reform Act of 1984 provided "intelligible principle[s]" required to delegate exactly "the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate." Id. at 379 (emphasis added).

> In light of our approval of . . . broad delegations, we harbor no doubt that Congress' delegation of authority to the Sentencing Commission is sufficiently specific and detailed to meet constitutional requirements. Congress charged the Commission with three goals: to "assure the meeting of the purposes of sentencing as set forth" in the Act; to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records [ ] while maintaining sufficient flexibility to permit individualized sentences," where appropriate; and to "reflect, to the extent

practicable, advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1). Congress further specified four "purposes" of sentencing that the Commission must pursue in carrying out its mandate: "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed [ ] correctional treatment." 18 U.S.C. § 3553(a)(2).

Id. at 374 (emphasis added). In rejecting a separations of powers challenge, the Court noted:

Although the unique composition and responsibilities of the Sentencing Commission give rise to serious concerns about a disruption of the appropriate balance of governmental power among the coordinate Branches, we conclude, upon close inspection, that petitioner's fears for the fundamental structural protections of the Constitution prove, at least in this case, to be "more smoke than fire," and do not compel us to invalidate Congress' considered scheme for resolving the seemingly intractable dilemma of excessive disparity in criminal sentencing.

Id. at 384.

The Guidelines dramatically altered sentencing in federal courts. See Burns v. United States, 501 U.S. 129, 132 (1991) ("The Sentencing Reform Act of 1984 revolutionized the manner in which district courts sentence persons convicted of federal crimes."). The Anglo-American tradition of individualized sentencing was largely abandoned, depriving sentencing judges of much of their discretion and importing many questions traditionally handled at the trial stage into the sentencing process. Due process considerations tended to be ignored. See Burns, 501 U.S. at 147 (Souter, J., dissenting) ("[A] defendant enjoys an expectation subject to due process protection that he will receive a sentence within the presumptively applicable range in the absence of grounds defined by the [Sentencing Reform] Act as justifying departure.") (emphasis added); Joseph W. Luby, Reining in the "Junior Varsity Congress": A Call for Meaningful Judicial Review of the Federal Sentencing Guidelines, 77 Wash. U.L.Q. 1199, 1207 (1999) ("harsher than Congress required or sound policy dictated").

17

### B. *Post*-**Booker**

In United States v. Booker, the Supreme Court held that the Sentencing Guidelines

violated the Sixth Amendment which requires that facts under a Guideline enhancing a

defendant's sentence be proven to a jury beyond a reasonable doubt. 543 U.S. 220, 226-27

(2005). Booker determined that the appropriate cure was to sever and excise the provision of the

statute that rendered the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). Booker, 543 U.S. at

245. As a result, the Guidelines are now advisory:

> We answer the question of remedy by finding the provision of the federal
> sentencing statute that makes the Guidelines mandatory incompatible with today's
> constitutional holding. We conclude that this provision must be severed and
> excised, as must one other statutory section which depends upon the Guidelines'
> mandatory nature. So modified, the federal sentencing statute makes the
> Guidelines effectively advisory. It requires a sentencing court to consider
> Guidelines ranges, but it permits the court to tailor the sentence in light of other
> statutory concerns as well.

Id. at 246. The Guidelines still remained part of the sentencing algorithm. See id. at 264.

(directing sentencing courts to consult the Guidelines when sentencing); see also 18 U.S.C. §

3553(a)(4) (directing sentencing courts to consider the Guidelines). The Sentencing Commission

was to continue to fulfill its statutory mission. Id. at 263 ("The Sentencing Commission will

continue to collect and study appellate court decisionmaking. It will continue to modify its

Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing

practices. It will thereby promote uniformity in the sentencing process.").

Also severed and excised was the provision of the statute requiring de novo review of

departures from the Guidelines, 18 U.S.C. § 3742(3), because that provision depended on the

mandatory nature of the Guidelines. Booker, 543 U.S. at 245. Appellate review of all sentences,

whether inside or outside of the Guideline range, was limited to "unreasonableness." Id. at 246.

18

Booker and cases that followed did not purport to lift the heavy weight of the Guidelines and their Commentary on the scales of justice. They could not be ignored under section 3553(a).

Courts of appeals at first held that although the Guidelines were now advisory, district courts could not substitute their own judgment of policy for the Sentencing Commission's. See e.g., United States v. Castillo, 460 F.3d 337, 356 (2d Cir. 2006) ("[N]othing in Booker suggests that it is the task of district court judges to pronounce broad policy choices rather than specific sentences based on the specific facts of a case."); United States v. Pho, 433 F.3d 53, 64-65 (1st Cir. 2006) ("[S]entencing decisions must be done case by case and must be grounded in case-specific considerations, not in general disagreement with broad-based policies enunciated by Congress or the Commission, as its agent."); United States v. Eura, 440 F.3d 625, 633-34 (4th Cir. 2006) (holding that district courts cannot give a lower sentence based on a policy disagreement with the Sentencing Commission) ; United States v. Williams, 456 F.3d 1353, 1364 (11th Cir. 2006) (same).

In three post-Booker decisions, Rita v. United States, 127 S. Ct. 2456 (2007), Gall v. United States, 128 S. Ct. 586 (2007), and Kimbrough v. United States, 128 S. Ct. 558 (2007), the Supreme Court elaborated on the effect of the Guidelines in light of their now advisory nature. In Rita, the Court held that courts of appeals can apply a presumption that a sentence imposed by the district court within a properly calculated Guideline range is reasonable. Rita, 127 S. Ct. at 2462-63. It noted that a presumption of reasonableness reflects the fact that, "by the time an appeals court is considering a within-in-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case." Id. at 2463 (emphasis in original).

Congressional delegation of authority to the Commission and the role of the sentencing

judge as envisioned by Congress are complementary:

> . . . [T]he presumption reflects the nature of the Guidelines-writing task that Congress set for the Commission and the manner in which the Commission carried out that task. In instructing both the sentencing judge and the Commission what to do, Congress referred to the basic sentencing objectives that the statute sets forth in 18 U.S.C. § 3553(a) . . . . That provision tells the sentencing judge to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution. The provision also tells the sentencing judge to "impose a sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing as set out above.

> Congressional statutes then tell the Commission to write Guidelines that will carry out these same § 3553(a) objectives. Thus, 28 U.S.C. § 991(b) indicates that one of the Commission's basic objectives is to "assure the meeting of the purposes of sentencing as set forth in [§ 3553(a)(2)]." The provision adds that the Commission must seek to "provide certainty and fairness" in sentencing, to "avoi[d] unwarranted sentencing disparities," to "maintai[n] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices," and to "reflect, to the extent practicable [sentencing-relevant] advancement in [the] knowledge of human behavior." Later provisions specifically instruct the Commission to write the Guidelines with reference to this statement of purposes, the statement that itself refers to § 3553(a). See 28 U.S.C. §§ 994(f), and 994(m).

> The upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale.

Id. at 2463 (emphasis in original). The judge in exercising discretion may not ignore the

Guidelines.

In Gall, the Court held that although the difference between a sentence imposed by the

judge and that recommended by the Guidelines is not decisive, courts of appeals must review all

sentences for reasonableness. Gall, 128 S. Ct. at 591. The Court again highlighted the

importance of the Guidelines and noted that a sentencing judge must give serious consideration

to them when imposing a non-Guideline sentence:

> As we explained in Rita, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. . . .

Id. at 596-97 (emphasis added).

In Kimbrough, the Court held that courts of appeals cannot apply a presumption that a

sentence outside the Guideline range is per se unreasonable when it is based upon a sentencing

judge's policy disagreement with the Commission's "crack-cocaine" Guidelines. Kimbrough,

128 S. Ct. at 564. The Court began by noting the sentencing disparity in the Guidelines for crack

and powder cocaine. It recognized that the 100-to-1 ratio applied by the Commission results in a

vast sentencing disparity between defendants charged with crack-cocaine and powder-cocaine

offenses. Id. at 566. Defendants charged with crack-cocaine offenses are sentenced to three to

six times longer prison terms than those charged with powder-cocaine offenses. Id. This

disparity originated in the Anti-Drug Abuse Act of 1986, in which Congress created a two-tier

scheme of five- and ten-year mandatory minimum sentences for drug manufacturing and

distribution offenses. Id. The five-year mandatory minimum applies to any defendant

responsible for 5 grams of crack-cocaine or 500 grams of powder; the ten-year applies to any

defendant responsible for 50 grams of crack or 5,000 grams of powder. Id. at 567. As a result of

this explicit congressional policy regarding crack-cocaine offenses, the Commission employed

the Anti-Drug Abuse Act's weight-driven scheme and set the offense level for crack-cocaine offenses much higher than that for powder-cocaine offenses. Id.

The district court in Kimbrough disagreed with the Commission's findings: "Concluding that the crack cocaine Guidelines drove the offense level to a point higher than is necessary to do justice in this case, the District Court thus rested its sentence on appropriate considerations . . ." Id. at 575-76 (citations and quotation marks omitted). The Supreme Court affirmed the district court's sentence even though the sentencing judge disagreed with the Commission's policy. But it reaffirmed the Guidelines' vitality in controlling a sentence:

> We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. The sentencing judge, on the other hand, has greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court. He is therefore in a superior position to find facts and judge their import under § 3353(a) in each particular case. In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply. On the other hand, while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case.

Id. at 575-76 (citations and quotation marks omitted; emphasis added).

A recent decision of the Court of Appeals for the Second Circuit described Kimbrough's impact as a "sea change" in sentencing jurisprudence. See United States v. Jones, __ F.3d ___, 2008 WL 2500252, at *14, 2008 U.S. App. LEXIS 13278, at *44 (2d Cir. Jun. 24, 2008). In United States v. Castillo, it joined the "First, Fourth, and Eleventh Circuits in holding that district courts may give non-Guidelines sentences only because of case-specific applications of the [18 U.S.C.] § 3553(a) factors, not based [solely] on policy disagreements with the disparity that the Guidelines for crack and powder cocaine create." 460 F.3d 337, 361 (2d Cir. 2006). It has

acknowledged that the collective affect of <u>Kimbrough</u> and <u>Gall</u> on a district court's discretion to disagree with the Guidelines may result in individual cases predicated upon a policy disagreement with the Commission. <u>United States v. Regalado</u>, 518 F.3d 143, 147 (2d Cir. 2008) (per curiam). In effect, the district court has broad discretion to individualize sentences based on the unique fact pattern before it, but may not rest solely upon rejection of policies properly adopted by the Sentencing Commission.

## C.    *Correct Calculation of the Guidelines Required*

Although the Sentencing Guidelines are now advisory, the defendant and government retain a right to their correct calculation. <u>See</u> <u>Gall</u>, 128 S. Ct. at 597 ("As we explained in <u>Rita</u>, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."); <u>United States v. Gray</u>, __ F.3d ___, 2008 WL 2853470, at *2, 2008 U.S. App. LEXIS 15726, at *4 (2d Cir. July 25, 2008) ("The first step of [reasonableness] . . . review is to ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range.") (quotation marks omitted); <u>United States v. Sanchez</u>, 517 F.3d 651, 661 (2d Cir. 2008) ("A sentence would be procedurally unreasonable if, for example, the sentencing judge . . . made an error in determining the applicable Guideline range . . .") (citations and internal quotation marks omitted); <u>United States v. Brown</u>, 514 F.3d 256, 263 (2d Cir. 2008) ("Since [the factors under 18 U.S.C. § 3553(a)] include the sentencing ranges established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . , the court is required to make a determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, despite the fact that such ranges are now advisory.") (internal quotation marks omitted); <u>United States v. Fagans</u>, 406 F.3d 138, 141 (2d Cir. 2005) ("In many circumstances, an

incorrect calculation of the applicable Guidelines range will taint not only a Guidelines sentence, if one is imposed, but also a non-Guidelines sentence, which may have been explicitly·selected with what was thought to be the applicable Guidelines range as a frame of reference."). Cf. United States v. Demaree, 459 F.3d 791 (7th Cir. 2006), cert. denied, 127 S. Ct. 3055 (2007) (holding that the Ex Post Facto Clause of the Fifth Amendment no longer prohibits the retroactive application of upwardly revised Sentencing Guidelines as it did prior to Booker); James Dillon, Doubting Demaree: The Application of Ex Post Facto Principles to the United States Sentencing Guidelines After United Sates v. Booker, 110 W. Va. L. Rev. 1033 (2008).

Recent data from the Sentencing Commission indicates that the Guidelines still largely determine sentences imposed. Nearly 60% of the roughly 26,000 defendants sentenced after Kimbrough received a sentence within the Guideline range. See U.S. Sentencing Commission, Preliminary Post-Kimbrough/Gall Data Report, tbl.1 (July 2008) (hereinafter, "Post-Kimbrough/Gall Data"), http://www.ussc.gov/USSC_Kimbrough_Gall_Report_July_08_Final.pdf. For about 25% of these below-Guideline range sentences, the court was authorized by the government to depart, largely in light of substantial assistance by the defendant, see U.S.S.G. § 5K1.1, or an early disposition program departure. See U.S.S.G. § 5K3.1. See Post-Kimbrough/Gall Data, tbl.1. Only 13.6% of defendants received a below-Guideline sentence without the government's authorization: in 3.3% of cases, the court departed from the Guidelines and in 10.3% of cases, the court gave a non-Guideline variance under Booker. Id.

It is apparent that the two-level enhancement for the fact that gun was stolen, required by the Sentencing Commission, cannot be ignored if it is valid. The power to circumvent granted by 18 U.S.C. § 3553(a) is not an excuse to disregard.

24

## IV. Enhancement for Stolen Gun

### A. *Guideline*

For defendants convicted under 18 U.S.C. § 922(g)(1) (felon-in-possession of a firearm), section 2K2.1(b)(4) of the Sentencing Guidelines mandates a two-level enhancement to the offense level if the firearm was stolen. See U.S.S.G. § 2K21.1(b)(4) ("If any firearm (A) was stolen, increase by 2 levels . . ."). Subsection (B) of the application note, which falls under the category of "Commentary," explicitly states that the two-level enhancement "applies <u>regardless of whether the defendant knew or had reason to believe that the firearm was stolen</u> . . ." <u>Id.</u> § 2K2.1 cmt. n.8(B) (emphasis added). No policy reason or rationale for requiring a two-level increase in the offense level—even when the defendant believed that the firearm was not stolen—is provided. The Commentary is as binding as a Guideline. <u>Stinson v. United States</u>, 508 U.S. 36, 37-38 (1993); <u>infra</u> section IV.D.1.b.

Another application note provides that the two-level enhancement does not apply if the defendant is specifically charged with an offense involving a stolen firearm, <u>see, e.g.</u>, 18 U.S.C. § 922(j). <u>See</u> U.S.S.G. § 2K2.1 cmt. n.8(A). "This is because the base offense level [for that crime of possessing a stolen firearm] takes into account that the firearm . . . was stolen." U.S.S.G. § 2K2.1 cmt. n.8(A). The defendant in the instant case was not charged with this section 922(j) offense or any offense involving stolen firearms.

An earlier version of U.S.S.G. § 1B1.3(a)(4), titled "Relevant Conduct (Factors that Determine the Guideline Range)", provided that "specific offense characteristics . . . shall be determined on the basis of . . . the defendant's state of mind, intent, motive and purpose in committing the offense." <u>See United States v. Taylor</u>, 937 F.2d 676, 682 (D.C.Cir. 1991) (citing U.S.S.G. § 1B1.3(a)(4) (earlier version)). This section was amended; the blanket scienter requirement was omitted. <u>Id.</u> The new version directs courts to consider "any other information

specified in the applicable guideline." U.S.S.G. § 1B1.3(a)(4). Section 2K2.1(b)(2), the

applicable Guideline in the instant case, contains no scienter element and, as noted <u>infra</u> section

IV.B., the courts of appeals have refused to read one in.

As pointed out by the Court of Appeals for the Third Circuit, U.S.S.G. § 2K2.1 and

related provisions have been amended several times, resulting in the elimination of any mens rea

requirement.

> The earlier version of § 2K2.1(b)(1) read "if the firearm was stolen or had an altered or obliterated serial number, increase by 1 level." The Commission renumbered and amended this section to increase the level to 2. U.S.S.G. § 2K2.1(b)(2). And the earlier versions of § 2K2.2(b)(1) and § 2K2.3(b)(2)(c) read respectively "If the firearm was stolen or had an altered or obliterated serial number, increase by 1" and "If the defendant <u>knew or had reason to believe</u> that a firearm was stolen or had an altered or obliterated serial number, increase by 1." (Emphasis added). The Commission consolidated these sections into new § 2K2.2(b)(2), which now reads "If the firearm was stolen or had an altered or obliterated serial number, increase by 2 levels." In amending these sections, the Commission also added new § 2K2.3, "Receiving, Transporting, Shipping or Transferring a Firearm or Ammunition With Intent to Commit Another Offense, or With Knowledge that It Will be Used in Committing Another Crime." The Commission intended this section to "address transfer of a weapon with <u>intent or knowledge</u> that it will be used to commit another offense." U.S.S.G., App. C, at C. 97 (emphasis added).

<u>United States v. Mobley</u>, 956 F.2d 450, 452 (3d Cir. 1992) (emphasis in original). The provision

has gone through further changes since <u>Mobley</u>. <u>See</u> U.S.S.G. App. C., amdts. 478, 522, 568,

575, 578, 586, 605, 629-31, 646, 669, 679, 680, 686, 691, 696, and 707. None of these

amendments have altered the two-level enhancement for a stolen firearm, nor have they provided

any indication of why the Commission believes that the enhancement is appropriate despite the

lack of knowledge that the firearm involved was stolen.

**B.**     ***Appellate Review***

*1.*     *Court of Appeals for the Second Circuit*

In a pre-Booker opinion, the Court of Appeals for the Second Circuit held that an earlier version of U.S.S.G. § 2K2.1(b)(4) did not contain a scienter requirement. United States v. Litchfield, 986 F.2d 21, 22-23 (2d Cir. 1993) (per curiam). The rule of lenity which requires the court to construe an ambiguous criminal statute in favor of the defendant, see Polizzi, 549 F. Supp. 2d at 377, was held to be inapplicable, without reaching the constitutional issues. Lichfield, 986 F.2d at 23 ("In sum, the language of 1989 Guidelines § 2K2.1(b)(2) was not ambiguous and did not contain a knowledge requirement, and the evolution of § 2K2 indicates that the omission of any such requirement was intentional. We conclude that there is no ambiguity and that the rule of lenity has no applicability.") (emphasis added).

In a subsequent opinion, the Court of Appeals for the Second Circuit did reach the constitutional issue and found that the two-level enhancement does not violate the due process clause of the Fifth Amendment. See United States v. Griffiths, 41 F.3d 844, 846 (2d Cir. 1994) (per curiam). The court relied upon the reasoning of the Court of Appeals for the Ninth Circuit in United States v. Goodell, 990 F.2d 497, 498-500 (9th Cir. 1993) "and other decisions that [had] addressed this issue." Griffiths, 41 F.3d at 846. Cited by the court were decisions of the Eleventh Circuit, United States v. Richardson, 8 F.3d 769, 770 (11th Cir. 1993); Tenth Circuit, United States v. Sanders, 990 F.2d 582, 584 (10th Cir. 1993), overruled on other grounds by United States v. Gomez-Arrellano, 5 F.3d 464, 466-67 (10th Cir. 1993); Ninth Circuit, Goodell, 990 F.2d at 498-500; Third Circuit, Mobley, 956 F.2d at 454-59; and Fifth Circuit, United States v. Singleton, 946 F.2d 23, 25-27 (5th Cir. 1991).

Even though the Sentencing Commission did not provide any rationale for the enhancement, the Court of Appeals for the Second Circuit suggested one post hoc by finding it reasonable to place on the acquirer of a firearm the burden of establishing that it was not stolen:

The government reasonably may determine that stolen firearms often end up in the hands of criminals, thus warranting a rule that imposes on the recipient of a firearm the burden of ensuring that the firearm is not stolen. In addition, the enhancement, which traditionally has been considered by sentencing courts, does not create a separate substantive offense calling for a separate penalty.

Griffiths, 41 F.3d at 846.

As to the contention that the enhancement is constitutionally impermissible for an offense that is not a minor crime of strict liability, the Court of Appeals for the Second Circuit held that U.S.S.G. § 2K2.1(b)(4) is a strict liability "enhancement," not a strict liability "crime," and that "the government has a legitimate interest in punishing possession of a stolen firearm and placing the burden upon one who receives a firearm to ensure that the possession is lawful." Id. at 845 (citing Mobley, 956 F.2d at 454-49).

Lithfield and Griffiths were pre-Booker decisions. They were decided before the "sea change" in sentencing, as described supra, in Jones by the Court of Appeals for the Second Circuit. That court has not addressed the enhancement for a stolen gun since the Supreme Court's decision in Booker, 543 U.S. 220. It has held that a different two-level strict liability enhancement under U.S.S.G. § 2K2.1(b)(4) for a firearm with an altered or obliterated serial number is valid. See United States v. Brown, 514 F.3d 256, 269 (2d Cir. 2008). That kind of enhancement is distinguishable from the one now addressed since an alteration or obliteration of serial number can be observed by the possessor, while whether the gun was stolen cannot. See 18 U.S.C. § 922(k). The fact that the gun was stolen is not visually detectable, nor is the criminal in possession capable of tracing the gun to determine if it was stolen, except in the most unusual circumstances.

2.      *Court of Appeals for the Third Circuit*

The pre-Booker opinions of the courts of appeals for the Third Circuit in Mobley, 956

F.2d 450 and the Ninth Circuit in Goodell, 990 F.2d 497 thoroughly discuss the two-level

enhancement.  In Mobley, 956 F.2d 450, the court proffered a justification for the two-level

enhancement in lieu of one not provided by the Commission.  See Mobley, 956 F.2d at 453.  By

a 2-1 decision, it rejected defendant's argument that "a distinction in sentences based solely on

the stolen status of the gun is arbitrary and capricious without evidence of scienter" and that it

"serves none of the purposes of sentencing—retribution, general deterrence, specific deterrence,

and rehabilitation—so that § 2K2.1(b)(2) is in discord with the purpose of the Guidelines." Id.

The majority reasoned that the enhancement is not in violation of the Commission enabling

statute setting forth its purposes because the expansive nature of section 922 of title 18 is

regulatory in nature and therefore evinces general congressional intent to harshly penalize

possession of stolen guns:

> Section 922(g) is part of the Gun Control Act of 1968 . . . . It is not just a
> statute criminalizing possession of a firearm by convicted felons; it is part of a
> comprehensive scheme to regulate the movement of firearms. . . . Thus § 922(g)
> has a regulatory role.
>
> Moreover, the penalty it imposes, including U.S.S.G. § 2K2.1(b)(2),
> advances this role. Altered firearms, for example sawed-off shotguns, "have few
> legitimate uses," U.S.S.G. § 2K2.1, commentary, and have most probably been
> altered to conceal or magnify their deadly potential. Also the trade in guns is
> monitored for a reason. Registration and verification procedures are imposed
> largely to combat crime. It is no secret that a chain of custody for a firearm
> greatly assists in the difficult process of solving crimes. When a firearm is stolen,
> determining this chain is difficult and when serial numbers are obliterated, it is
> virtually impossible. Therefore, stolen or altered firearms in the hands of people
> recognized as irresponsible pose great dangers, and the guideline here reflects this
> heightened danger.
>
> An examination of 18 U.S.C. § 922(g), § 922(i), § 922(j) and U.S.S.G. §
> 2K2.1(b)(2) shows how Congress and the Commission regulate the trade in stolen
> or altered firearms. Together § 922(i) and § 922(j) provide that any person who
> "transport[s]" or "receive[s] . . . any stolen firearm or stolen ammunition,
> knowing or having reasonable cause to believe" it stolen is culpable. In these

sections Congress recognized the inherent evil in stolen guns and sought to regulate them. Section 922(g) targets a specific class of individuals—convicted felons. It provides that they shall not possess any firearm, regardless of the status of the firearm. So, for instance, if a convicted felon went into a sporting store, bought a shotgun to hunt, and signed all the necessary registration and verification forms, he would still be culpable. And if he obtained such a weapon from a drug dealer in some back street, it is reasonable that he would be more culpable.

Thus § 2K2.1(b)(2) advances the overall regulatory scheme. Without empirical evidence, it is safe to say that stolen or pirated guns move in the back alleys and among clandestine meetings of the criminal world. Indeed Mobley admitted that he got his gun from a drug dealer named "Keith" in Columbia, South Carolina. A handgun is the consummate anti-personnel weapon. It is designed to be used against people. It defies reason to believe that there was anything benign in a convicted felon carrying a stolen handgun. Section 2K2.1(b)(2) regulates by punishing and potentially deterring such irregular and pernicious transactions; it rests on the theory that one would hardly be surprised to learn that possession of a gun bought from a drug dealer is not an innocent act .
. . .

Id. at 453-54 (some citations, quotation marks and footnote omitted; emphasis added). The court

disregarded section 922's specific directives requiring knowledge of a firearm's characteristics

(e.g. whether it was stolen) before penalizing the defendant. See infra section IV.D.2.b.

The Commission's basis for the two-level enhancement, as manifested by the

Commentary to an earlier version of U.S.S.G. § 2K2.1, was that defendants in possession of

stolen firearms tended to receive harsher sentences pre-Guidelines and that stolen firearms are

used disproportionately in crimes. This justification is hardly persuasive since the proof in some

cases with harsher sentences may have established that the defendant stole it himself or knew it

was stolen.

The Court of Appeals in Mobley added its own rationale:

The Commission decided that possessing a stolen gun is a greater evil than possessing one legally purchased. Indeed, the inherent dangers associated with a convicted felon purchasing and owning a gun "makes it reasonable to impute knowledge to the defendant that his conduct was subject to legal restriction." One, especially a convicted felon, is thus expected to exercise caution in the purchase of firearms and to inquire as to the gun's origin. One can check easily

whether or not a gun has been stolen, and the failure to do so reasonably may add to the purchaser's punishment. The government need not prove that the purchaser possessed actual knowledge of the gun's stolen status to generate the inference for the purpose of sentencing that a buyer of a stolen gun is more culpable than the buyer of a legitimate one. The "backstreet" buyer who contributes financially to a thief's enterprise purchases under conditions which reasonably should alert him to check the gun's legitimacy. We fail to see the constitutional infirmity in discouraging illegal traffic in guns by enhancing the sentence of a convicted felon for possessing a stolen gun.

Id. at 456 (citations omitted) (emphasis added). The assumption in Mobley that a criminal

purchasing a gun out of the trunk of a car in Brooklyn could "easily" determine whether the gun

was obtained by the seller as a result of a straw sale in Georgia or a theft in some other state does

not accord with practice in the illegal gun market. See infra section IV.D.2.b.iii. (discussing

unlawful practices of gun retailers related to stolen firearms).

The Mobley court found unconvincing defendant's argument that the enhancement

violates the due process clause of the Fifth Amendment by in effect creating a new statute

lacking a requirement of scienter and punishing for conduct for which the defendant has not been

found guilty. Id. at 454-55. It reasoned that the enhancement does not alter the maximum

penalty available for the crime, negate the presumption of innocence or relieve the government

of its burden of proving guilt, or create a separate offense calling for a separate penalty. Mobley,

956 F.2d at 456. The court's conclusion was based on the premise—somewhat inconsistent with

Booker, 543 U.S. 220—that the defendant is entitled to less constitutional protections during the

sentencing phase:

> [Defendant] confuses the fundamental distinction between conviction and sentencing. Moreover he confuses the distinction among a sentence, a sentence enhancement, and the definition of a crime. In our bifurcated criminal justice process, at the trial stage the accused receives the full panoply of constitutional rights. So for example, the government must prove "beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." At the sentencing stage, however, a convicted criminal is entitled to less process than a presumptively innocent accused. Sentencing courts have always operated without

constitutionally imposed burdens of proof when considering the appropriate sentence.

Mobley, 956 F.2d at 455 (citations and quotation marks omitted).

Dissenting in Mobley, one judge analyzed the constitutional consequences of allowing the prosecution to either indict a defendant for possession of a stolen firearm (which would require proof that the defendant knew that the gun was stolen, see 18 U.S.C. § 922(j)), or if it could not satisfy that burden, to seek the same punishment under the Guidelines, see U.S.S.G. § 2K2.1(b)(4). See Mobley, 956 F.2d at 459 ff. (Mansmann, J., dissenting) ("Because I do not believe that a sentencing enhancement under the Guidelines may be substituted for a criminal conviction consistent with substantive due process, or alternatively, that the preponderance standard here satisfies procedural due process, I would reverse and remand."). The dissent noted that the majority's assertion that the enhancement is rationally related to a legislative purpose because of the regulatory and expansive nature of federal criminal firearms laws is in conflict with explicit legislative purpose:

> The majority reasons that guideline § 2K2.1(b)(2) rationally furthers the purposes of the 1968 Gun Control Act, positing that the Act is part of a comprehensive scheme to regulate the movement of firearms and guideline § 2K2.1(b)(2) "advances the overall regulatory scheme" because it "regulates" transactions in stolen firearms, which are more likely to be used in criminal activity. While I agree with the majority's assertion that the guideline enhancement at issue here was promulgated to address regulatory concerns, see, e.g., U.S.S.G. § 2K2.1, comment. (backg'd.) ("[i]ndependent studies show that stolen firearms are used disproportionately in the commission of crimes"), I do not find guideline § 2K2.1(b)(2), insofar as it purports to be a strict liability enhancement, to be rationally related to a legislative purpose because the Gun Control Act evidences another explicit legislative purpose. As the government admits, to convict Mobley for a stolen firearm charge, it would have had to prove that Mobley "[knew] or [had] reasonable cause to believe that the firearm . . . was stolen." 18 U.S.C. § 922(i) or (j).

. . . .

I depart from the majority, however, because it has mismatched portions of the Gun Control Act with guideline § 2K2.1(b)(2). The pertinent match is highlighted by the government's choice; thus we should evaluate Mobley's constitutional claim against the conflict between the scienter element of the stolen firearms crimes and the lack of a scienter element in a stolen firearm guideline enhancement of § 2K2.1(b)(2), where both yield the same penalty.

Id. at 462-63 (some citations omitted); see also id. at 463 ("Where, as here, Congress has spoken more directly to an issue, we should hesitate to invoke general legislative statements in support of a guideline that so clearly controverts a more explicit legislative intention."); id. at 465 ("Where Congress has chosen to require scienter for proof of a crime, I am not persuaded that Congress' designee, the Sentencing Commission, may transform that same conduct, minus scienter, into a sentencing factor, which when applied yields an equivalent sentence range as would an additional conviction.").

After Booker, the Court of Appeals for the Third Circuit re-examined its holding in Mobley. See United States v. Rouse, 226 Fed. App'x 97, 99 (3d Cir. 2007). The defendant in Rouse argued that the two-level enhancement violates Apprendi v. New Jersey, 530 U.S. 466 (2000) and Booker, 543 U.S. 220 which drew no distinction between an element of a felony offense and a sentencing enhancement that needed to be found by a jury. Rouse, 226 Fed. App'x at 99. The court rejected this argument:

[T]he portion of Apprendi to which Rouse cites is merely a description of the historical fact that there was no distinction between a sentencing enhancement and an element of a crime at the time of our Nation's founding. Nothing in Apprendi eliminates the ability of a sentencing judge to consider facts not included in the indictment when imposing a sentence, so long as that sentence is at or below the statutory maximum.

The same is true for Booker. Booker held that the Guidelines, which were mandatory as written, violated the Sixth Amendment as they allowed the judge to increase a defendant's sentence beyond the maximum sentence laid out by statute. Therefore, the Supreme Court excised the portions of the Sentencing Reform Act that made the Guidelines mandatory, resulting in an advisory Guidelines system that is but one factor a judge should consider when imposing sentence. While this

decision reinforced the importance of the jury's role in criminal convictions and sentencing determinations, it did not eliminate the distinction between sentencing factors and the elements of a crime. Rather, post-Booker, when calculating a defendant's advisory Guidelines range, a district court is to follow the Guidelines just as it had done pre-Booker. We have repeatedly stated that in doing so, district courts should continue to consider our pre-Booker case law.

Id. (citations omitted). The court held that Apprendi and Booker did not undermine its holding in Mobley and that the enhancement is constitutional. Id. at 99-100.

### 3. Court of Appeals for the Ninth Circuit

In Goodell, contrary to the instant case, defendant's plea agreement specified that the weapon was stolen. Goodell, 990 F.2d at 498. The Court of Appeals for the Ninth Circuit found that the enhancement does not require scienter, id. at 498-99, and that it is rationally related to a legitimate government interest in that stolen firearms tend to be used more frequently in crimes than do other weapons:

> The strict liability enhancement for possession of a stolen firearm is rationally related to the legitimate governmental goal of crime prevention: § 2K2.1(b)(2) was promulgated on the premise that "stolen firearms are used disproportionately in the commission of crimes." Mobley, 956 F.2d at 454, citing, U.S.S.G. § 2K2.1(b)(2), comment. Further, an ex-felon who obtains a stolen firearm is more culpable than one who legally obtains a firearm. Mobley, 956 F.2d at 454. See also Schnell, 982 F.2d at 221 ("[T]he Sentencing Commission's decision to place upon a felon the burden of inquiring into the condition of any weapon that he unlawfully obtains was not inconsistent with the manifestations of Congressional intent contained in §§ 922(g) or 922(k)."). The omission of a mens rea requirement for the stolen gun sentencing enhancement under § 2K2.1(b)(2) does not violate due process.

Id. at 499.

Goodell found that the enhancement did not to violate the due process clause standard in McMillan v. Pennsylvania, 477 U.S. 79 (1986). Goodell, 990 F.2d at 500. In McMillan, the Supreme Court had held that a sentencing enhancement violates the due process clause of the Fifth Amendment if (1) it alters the maximum statutory penalty available for the crime, (2)

negates the presumption of innocence or relieve the government's burden of proving guilt beyond a reasonable doubt, or (3) creates a separate offense calling for a separate penalty. McMillan, 477 U.S. at 87-88. The court found that the enhancement does not alter the maximum penalty, negate the presumption of innocence, Goodell, 990 F.2d at 500, or create a separate offense calling for a separate penalty:

> The Sentencing Guidelines' enhancement for a stolen weapon . . . did not present [the defendant] with a "radically different situation" at sentencing; the two point enhancement raised [defendant's] sentencing range from 8-14 months to 12-18 months. Further, a stolen firearm "tended to result in more severe sentences" in pre-guideline cases. U.S.S.G. § 2K2.2, comment. (backg'd.). . . . [T]he enhancement here "simply took one factor that has always been considered by sentencing courts to bear on punishment ... and dictated the precise weight to be given that factor." McMillan, 477 U.S. at 89-90.

Id. at 500-01 (some citations omitted; emphasis to "U.S.S.G. § 2K2.2, comment. (backg'd)" added).

Even though the Sentencing Commission had not provided any reasons for the two-level enhancement required by U.S.S.G. § 2K2.1(b)(4), Goodell cited to the background Commentary of a different provision, U.S.S.G. § 2K2.2, which had already been deleted, to provide the rationale. See Goodell, 990 F.2d at 501 (citing U.S.S.G. § 2K2.2, comment. (backg'd)). While acknowledging a lack of supporting data, the Commission's deleted Commentary did touch on the subject of reasons:

> Available pre-guidelines data were not sufficient to determine the effect a stolen firearm had on the average sentence. However, reviews of pre-guidelines cases suggested that this factor tended to result in more severe sentences. Independent studies show that stolen firearms are used disproportionately in the commission of crimes.

Id. App. C. amd. 374 (deleting the earlier version of U.S.S.G. § 2K2.1) (emphasis added). As already noted, supra, this statistical excuse is less than persuasive on the issue of scienter.

Defendant's argument in <u>Goodell</u> that the enhancement circumvents congressional intent in requiring mens rea when criminalizing possession of stolen firearm in a separate statute, <u>see</u> 18 U.S.C. §§ 922(i) and 922(j), and mandates a sentence equal to that resulting from that particular statute without requiring the prosecution to prove scienter, was dismissed in a footnote: "[Defendant] was charged with a violation of § 922(g), not § 922(i). [Defendant] has not argued that his constitutional rights were violated by the prosecution's decision to charge him with § 922(g)." <u>Goodell</u>, 990 F.2d at 500 n.4.

The Court of Appeals for the Ninth Circuit revisited the enhancement post-<u>Booker</u> in a different context. <u>See</u> <u>United States v. Ellsworth</u>, 456 F.3d 1146, 1149 (9th Cir. 2006). In <u>Ellsworth</u>, the defendant argued that the enhancement violates "his Fifth Amendment right to <u>equal protection</u> by treating supposedly similarly situated felons differently without a rational basis." <u>Id.</u> (emphasis added). He drew a contrast between the two-level strict liability enhancement for possession of a stolen firearm under U.S.S.G. § 2K2.1(b)(4) and the two-level enhancement for possession of stolen explosives under U.S.S.G. § 2K1.3(b)(2) which applies only when " 'the defendant knew or had reason to believe' the explosives were stolen." <u>Ellsworth</u>, 456 F.3d at 1149 (quoting U.S.S.G. § 2K1.3(b)(2)). The harsher treatment of felons in possession of stolen firearms, he argued, "is irrational because stolen explosives are far more dangerous than stolen firearms." <u>Id.</u> (internal quotation marks omitted). The court rejected this equal protection argument under a deferential level of scrutiny:

> Under rational basis review, the distinction for sentencing purposes between felons in possession of stolen firearms and those in possession of stolen explosives "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." <u>FCC v. Beach Commc'ns</u>, 508 U.S. 307 (1993) (emphasis added). It is reasonably conceivable that although explosives are in theory more deadly than firearms when compared on an individualized basis, stolen firearms are more readily obtainable by felons and therefore more deadly than stolen explosives in

the aggregate. "Or so the legislature may think." Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1955); see also id. at 487-88 (upholding an Oklahoma law under equal protection rational basis review by positing numerous hypothetical justifications for the law without considering whether or not the legislature actually considered such justifications).

Id. at 1150 (emphasis in original). No factual basis for believing that it is easier to steal firearms than explosives was provided.

4. *Courts of Appeals for the Fourth, Fifth, Sixth, Eighth, Tenth, Eleventh, and District of Columbia Circuits*

The pre-Booker opinions of the courts of appeals for the Eleventh Circuit in Richardson, 8 F.3d 769, the Tenth Circuit in Sanders, 990 F.2d 582, the Eighth Circuit in United States v. Martinez, 339 F.3d 759, 762 (8th Cir. 2003), the Sixth Circuit in United States v. Murphy, 96 F.3d 846, 848-49 (6th Cir. 1994) and United States v. Burns, 109 Fed. App'x 52 (6th Cir. 2004), the Fifth Circuit in Singleton, 946 F.2d 23, the Fourth Circuit in United States v. Rollins, 47 Fed. App'x 236 (4th Cir. 2002) (per curiam) and the District of Columbia in United States v. Taylor, 937 F.2d 676, 682 (D.C. Cir. 1991) are consistent with the rulings of the Second, Third and Ninth Circuits already discussed. They do not shed additional light on how the two-level enhancement for a stolen gun, not known to be stolen by defendant, might further any of the purposes set forth by Congress in the Commission's enabling legislation, or how it is rationally related to a legitimate governmental interest.

These decisions, similarly to Goodell, but with less analysis, hold that the rule of lenity does not apply to U.S.S.G. § 2K2.1(b)(4) and that the enhancement is not barred by the presumption against a strict liability crime. See Richardson, 8 F.3d at 770 ("[T]he lack of a mens rea element in the sentencing enhancement for possession of a stolen firearm does not offend due process .... [T]he rule of lenity does not require that the government prove [the defendant] knew the firearm was stolen.") (citations omitted); Sanders, 990 F.2d at 584 ("The government is

not obliged to show that defendant knew the firearm was stolen for the enhancement to apply. Defendant's strict liability argument is equally unavailing."); Martinez, 339 F.3d at 762 ("We now join every other circuit to have addressed the issue and explicitly hold that § 2K2.1(b)(4) does not violate the constitution."); Murphy, 96 F.3d at 848-49 (upholding the enhancement); Burns, 109 Fed. App'x at 55-58 (revisiting the enhancement after Blakely v. Washington, 542 U.S. 296 (2004) and upholding it); Singleton, 946 F.2d at 27 ("The plain language of the guidelines, as well as the apparent intent of the drafters, evidences the Commission's wishes that a[n] . . . upward adjustment be assessed against a felon who possesses a stolen gun, regardless of whether he knew the gun was stolen. Because this upward adjustment occurs during sentencing, when district court discretionary authority is especially broad, this adjustment does not offend due process."); Rollins, 47 Fed. App'x at 236 ("Rollins' objection to the application of the two-level offense level enhancement of § 2K2.1(b)(4) is meritless, as that provision applies even if Rollins was unaware the firearm he pled guilty to possessing was stolen."); Taylor, 937 F.2d at 682 ("Because section 2K2.1 is unambiguous in its imposition of strict liability for possession of a stolen firearm, the presumption against strict liability does not apply."); cf. United States v. Schnell, 982 F.2d 216, 219 (7th Cir. 1992) (holding that an earlier version of U.S.S.G. § 2K2.1(b)(4) which required a four-level enhancement for an altered serial number without the defendant's knowledge is constitutional).

Some of these courts have revisited the issue after Booker, 543 U.S. 220 and have continued to hold that the U.S.S.G. § 2K2.1(b)(4) enhancement and others lacking scienter are constitutional. Cf., e.g., United States v. Brazinskas, 458 F.3d 666, 668-69 (7th Cir. 2006) (holding that the enhancement under U.S.S.G. § 3B1.3 without requiring scienter is permissible).

C.    *Reconsideration Under the Sixth Amendment Line of Cases*

The two-level strict liability enhancement for a stolen gun must be reconsidered in light of the protections now afforded to a defendant in sentencing proceedings. Distinctions that afforded the defendant reduced constitutional protections in sentencing are now obsolete in part. See infra section IV.C.1. and supra section III.B.

1.    *Developing Sixth Amendment Defendants' Protections in Sentencing*

In McMillan v. Pennsylvania, the Supreme Court reviewed the constitutionality of a Pennsylvania law requiring a five year mandatory minimum sentence for a person found guilty of certain felonies if the sentencing judge found, by a preponderance of the evidence, that the person "visibly possessed a firearm" during the commission of the crime. McMillan, 477 U.S. at 81. A 5-4 majority held that visible possession of a firearm is not an element of the crimes enumerated in the state's mandatory sentencing statute and is instead "a sentencing factor that comes into play only after the defendant has been found guilty of one of those crimes beyond a reasonable doubt." Id. at 86 ("[W]e should hesitate to conclude that due process bars the State from pursuing its chosen course in the area of defining crimes and prescribing penalties.").

The dissenting opinions of Justice Marshall, joined by two other justices, and of Justice Stevens would have held that any enhancement must be proven beyond a reasonable doubt:

> Once a State defines a criminal offense, the Due Process Clause requires it to prove any component of the prohibited transaction that gives rise to both a special stigma and a special punishment beyond a reasonable doubt. This much has been evident at least since In re Winship, 397 U.S. 358 (1970). In that case, the Court "explicitly" held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Id., at 364.

Id. at 96 (Stevens, J., dissenting); see also id. at 94 (Marshall, J., dissenting ("For now, it is enough to agree with Justice Stevens that if a State provides that a specific component of a prohibited transaction shall give rise both to a special stigma and to a special punishment, that

component must be treated as a fact necessary to constitute the crime within the meaning of our holding in In re Winship . . .") (internal quotation marks omitted).

Supreme Court decisions in the past ten years have moved towards the Marshall-Stevens view. They have highlighted the constitutional dangers in removing from the jury assessment of facts by a beyond a reasonable doubt standard that incorporates constitutional protections if they increase the prescribed range of penalties to which a criminal defendant is exposed. See Almendarez-Torres v. United States, 523 U.S. 224 (1998); Monge v. California, 524 U.S. 721 (1998); Jones v. United States, 526 U.S. 227 (1999); Apprendi, 530 U.S. 466; Ring v. Arizona, 536 U.S. 584 (2002); Blakely, 542 U.S. 296; Booker, 543 U.S. 220; Cunningham v. California, 549 U.S. 270 (2007).

In Almendarez-Torres, a 5-4 Court held that a statutory provision enhancing a defendant's sentence for illegally re-entering the United States if he or she had been deported subsequent to an aggravated felony conviction is a penalty provision which authorizes the sentencing court to increase the sentence. Almendarez-Torres, 523 U.S. at 226-27. The Court declared that the enhancement is not a separate crime and the government is not required to charge it in the indictment or prove it to a jury beyond a reasonable doubt. Id. at 227. The Court's holding sparked a dissent by four Justices which suggested the Court's shifting jurisprudence on the Sixth Amendment, culminating in Booker.

The dissent in Almendarz-Torres analyzed case law interpreting the Sixth Amendment as requiring that all elements of a crime be proven to a jury beyond a reasonable doubt.

> In all our prior cases bearing upon the issue, however, we confronted a criminal statute or state-court criminal ruling that unambiguously relieved the prosecution of the burden of proving a critical fact to the jury beyond a reasonable doubt. In McMillan v. Pennsylvania, 477 U.S. 79 (1986), the statute provided that visible possession of a firearm shall not be an element of the crime, but shall be determined at sentencing by the court by a preponderance of the evidence. In

In re Winship, 397 U.S. 358 (1970), it provided that determinations of criminal action in juvenile cases must be based on a preponderance of the evidence. In Patterson v. New York, 432 U.S. 197 (1977), the statute provided that extreme emotional disturbance is an affirmative defense. And in Mullaney v. Wilbur, 421 U.S. 684 (1975), Maine's highest court had held that in murder cases malice aforethought was presumed and had to be negated by the defendant.

Id. at 248-49 (Scalia, J., dissenting) (quotation marks, alterations and some citation omitted).

Without reaching the issue of whether the Constitution requires that the "recidivist" provision be proven before a jury beyond a reasonable doubt, the dissent argued that the text of the statute construed under the doctrine of constitutional doubt requires such a conclusion. Id.

In Jones, a 5-4 Court rejected an interpretation of the federal carjacking statute, 18 U.S.C. § 2119, which would have defined it as a single crime with a choice of three maximum penalties, "two of them dependent on sentencing factors exempt from the requirements of charge and jury verdict." Jones, 526 U.S. at 229. It held that the better and constitutionally congruent reading of the statute is of three distinct offenses which must be charged in the indictment and proven to a jury beyond a reasonable doubt. Id. Justices Stevens and Scalia, who joined the majority opinion, wrote separate concurring opinions noting the importance of the constitutional issues requiring jury consideration of sentencing enhancements. See id. at 252-53 (Stevens, J., concurring) ("[I] am convinced that it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt."); id. at 253 (Scalia, J., concurring) ("[I]t is unconstitutional to remove from the jury the assessment of facts that alter the congressionally prescribed range of penalties to which a criminal defendant is exposed."). See also Monge, 524 U.S. at 738 (Scalia, J., dissenting).

Apprendi was the first case explicitly holding that under the Sixth Amendment, any fact other than a prior conviction which increases the penalty of a crime must be submitted to a jury and proven beyond a reasonable doubt. Apprendi, 530 U.S. at 490. At issue was a New Jersey statute requiring a jury conviction for possession of a prohibited weapon and then permitting the judge to impose a sentence based upon his or her own findings by a preponderance of evidence of the following "sentencing enhancement:" the defendant's purpose was to intimidate the victim on the account of certain immutable characteristics such as race or gender. Id. at 492-93. The Court reasoned that "[m]erely using the label 'sentence enhancement' to describe the latter surely does not provide a principled basis for treating them differently." Id. at 476. Analyzed by the Court was common law practice predating the Constitution which drew no distinction between what is now characterized as an "element" of an offense and "sentencing factor." Id. at 479-82. The Court invalidated the New Jersey sentencing scheme and concluded:

> The historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties provided highlight the novelty of a legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.

Id. at 482-83 (footnote omitted). See also Ring, 536 U.S. at 609 ("Because Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury.") (quotation marks omitted).

In Blakely, Washington State's sentencing guidelines, which resembled their federal counterpart, were invalidated because they permitted enhancement of a defendant's sentence based on facts found by a judge by a preponderance of evidence. Blakely, 542 U.S. at 305-06 ("Our commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere

42

procedural formality, but a fundamental reservation of power in our constitutional structure."). As discussed supra section III.B., Booker extended Apprendi's protections to the federal Sentencing Guidelines and excised their mandatory nature. Booker, 543 U.S. at 245. And in Cunningham, the Court held that California's determinate sentencing law which assigned to the judge authority to find facts that exposed a defendant to an elevated "upper term" sentence was unconstitutional under Apprendi and its progeny. Cunningham, 549 U.S. 270.

### 2.   Loss of Force in Enhancement Precedents

After it was held that the Sentencing Commission did not violate delegation of power and separation of powers, see Mistretta, 488 U.S. 361, the Supreme Court and courts of appeals appeared to recognize in the Commission an unfettered discretion in formulating the Guidelines and in limiting sentencing court's authority to impose a sentence outside of the Guideline range. See Douglas A. Berman, Balanced and Purposeful Departures: Fixing a Jurisprudence That Undermines the Federal Sentencing Guidelines, 76 Notre Dame L. Rev. 21, 50-51 fn. 110 & 111 (2000) (collecting cases); supra sections III.A. and IV.B. It was argued that the Commission's determinations of what constitutes an appropriate sentence largely remain unregulated by the courts. See, e.g., Ronald F. Wright, Sentencers, Bureaucrats, and the Administrative Law Perspective on the Federal Sentencing Commission, 79 Calif. L. Rev. 1, 16-17 (1991) ("For other independent agencies, the trappings of adjudicatory fairness have filled this gap. Agency actions that result from procedures that more or less resemble a civil trial will undoubtedly appear more legitimate. However, the Sentencing Commission does not rely on such accoutrements of fairness. It does not adjudicate cases, nor does it follow procedures that mimic a judicial trial. It only drafts guidelines that others—that is, judges—will apply during sentencing proceedings.") (footnotes omitted).

This view of unlimited power has changed. See supra section IV.C.1.; Booker, 543 U.S. 220; Rita, 127 S. Ct. 2456; Gall, 128 S. Ct. 586; Kimbrough, 128 S. Ct. 558. Intermediate appellate court decisions holding that the two-level enhancement for a stolen gun does not violate McMillan require reconsideration in light of new Supreme Court precedent.

## D.    Invalidity

### 1.    General Problems in Reviewing the Sentencing Commission's Determinations

#### a.    Administrative Law Framework

A number of fundamental problems of constitutional dimensions exist in administrative law. First, are the problems an agency creates with structures that seem to violate constitutional separation and delegation of powers. Second, is the problem of how an appropriate check can be provided when an agency determination affects rights in individual cases.

The first problem of constitutional structures and separation of powers has been largely resolved for the typical agencies by the non-delegation and "intelligible principles" doctrine. See, e.g., Whitman v. Am. Trucking Assoc., 531 U.S. 457 (2001). The second of due process owed to those affected by an agency's quasi-legislative (i.e., rulemaking), quasi-executive (i.e., enforcement) and quasi-judicial (i.e., adjudication) functions has been largely alleviated by the safeguards afforded by federal Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-559, 701-706, and judicial review of agency determinations. See e.g., Walter Gellhorn, The Administrative Procedure Act: The Beginnings, 72 Va. L. Rev. 219 (1986) (discussing the legislative history of the act).

The Sentencing Commission, an agency theoretically within the judicial branch of the government, has survived separation of powers and delegation of power challenges. See Mistretta, 488 U.S. 361. How the Commission's determinations affecting due process rights of

defendants can be judicially reviewed presents a more difficult issue. See Ronald F. Wright, Sentencers, Bureaucrats, and the Administrative Law Perspective on the Federal Sentencing Commission, 79 Calif. L. Rev. 1, 41 (1991) ("Normally, when a court reviews the activity of an agency, it has clear statutory license to do so. Often the license flows from the judicial review provisions of the APA. It is unclear whether these review provisions (or something equivalent) are available to structure the relationship between the courts and the Sentencing Commission.") (footnotes omitted).

Although the Sentencing Commission must follow the notice and comment rulemaking procedures of the APA, see 28 U.S.C. § 994(x), the APA mechanisms for judicial review of agency determinations have not been applied to the Sentencing Commission on the ground that it is an agency within the judicial branch. See 5 U.S.C. § 551 (defining agency as "each authority of the Government of the United States . . . but . . . not includ[ing] . . . the courts of the United States"); see also John C. Coffee, Jr., The Repressed Issues of Sentencing: Accountability, Predictability, and Equality in the Era of the Sentencing Commission, 66 Geo. L. J. 975, at 998-99 & n.65 (1978) (creation of Sentencing Commission in place of Parole Commission substituted an "agency that is largely immune from the reach of the [APA] for one that has been largely subject to the Act") (footnotes omitted); In re Fidelity Mortgage Investors, 690 F.2d 35, 37-38 (2d Cir. 1982) (rulemaking provision of APA does not apply to the United States Judicial Conference); Tashima v. Admin. Office of U.S. Courts, 719 F. Supp. 881, 886 (C.D. Cal. 1989) (Administrative Office of U.S. Courts is not an "agency" governed by the APA); cf. 44 U.S.C. § 1501 (excluding legislative and judicial branches from definition of "agency" in Federal Register and Code of Federal Regulations); but see Mistretta, 488 U.S. at 393 (Sentencing Commission "is an independent agency in every relevant sense") (emphasis added); see generally Monograph,

Reform of Court Rule-Making Procedures (1977); Geoffrey C. Hazard, Jr., Book Review, Undemocratic Legislation, 87 Yale L. J. 1284 (1987) (Book Review of Reform of Court Rule-Making Procedures); James L. Oakes, Book Review, Reform of Court Rule-Making Procedures, 78 Colum. L. Rev. 205 (1978) (same).

Challenges to a particular Guideline as "arbitrary and capricious" and defendants' attempts to enforce the procedures that bind the Sentencing Commission under the familiar administrate law framework are foreclosed by current appellate cases. See, e.g., United States v. Lopez, 938 F.2d 1293, 1297 (D.C. Cir. 1991) ("Applying the principle of inclusio unius est exclusio alterius, we conclude that by subjecting the promulgation of the Guidelines to this one section of the APA, Congress affirmed that the [Sentencing] Commission's rulemaking was not subject to any other provision of the APA, including those for judicial review."); Wash. Legal Found v. U.S. Sentencing Comm'n, 17 F.3d 1446, 1450 (D.C. Cir. 1994) (holding that, unless specified by statute, the APA does "not apply to the [Sentencing] Commission because it is a part of the judicial branch."); United States v. Wimbush, 103 F.3d 968, 970 (11th Cir. 1997) ("Federal courts do not have authority to review the [Sentencing] Commission's actions for compliance with APA provisions, at least insofar as the adequacy of the statement of the basis and purpose of an amendment is concerned."). Such cases need reconsideration. Cf. 28 U.S.C. § 994(p) (requiring the Sentencing Commission to include a "statement of reasons" when amending the Guidelines). As one commentator has comprehensively described the matter, the inapplicability of the administrative law framework to the Sentencing Commission has lead to: (1) "errors of law" which include the Commission's disregard of numerous statutory factors under 18 U.S.C. § 3553(a) that call for a "reasoned judicial discretion in sentencing"; (2) "failures of rationality" in the purposes of sentencing, in quantities and qualities of drugs and

justifying why particular classes of sentences in the pre-Guidelines system were inadequate; and (3) "failures of procedure" in lack of transparency in the promulgation and amendment of Commentary, see supra section IV.D.1.b., and lack of public scrutiny resulting from more meetings held behind closed doors. See Joseph W. Luby, Reining in the "Junior Varsity Congress": A Call for Meaningful Judicial Review of the Federal Sentencing Guidelines, 77 Wash. U.L.Q. 1199, 1210-24 (1999). See also John Gleeson, The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Sentencing Bargains, 36 Hofstra L. Rev. 639, 645 (2008) ("This is not the way sentencing policy should be made"); id. at 646 ("important policy changes are made by stealth").

b.      Review of Commentary

The problem is complicated by the fact that mechanisms for congressional review of the Sentencing Guidelines are incomplete. The Guidelines Manual contains three varieties of text: (1) Guideline provisions, (2) Policy Statements and (3) Commentary. See Stinson, 508 U.S. at 41. The Guideline provision directs the court to an appropriate type and length of sentence within a range based on the total offense level and criminal history of the defendant. Id. The Policy Statements, which are authorized by the Commission enabling statute, see 28 U.S.C. § 994(a)(2), are the Commission's statements regarding application of the Guidelines or other aspects of sentencing that further the purposes of sentencing. Stinson, 508 U.S. at 41. The Commentary, although not expressly authorized, are referred to by the enabling act. See 18 U.S.C. § 3553(b) (in determining whether to depart from a Guideline range, "the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission"). Contrary to the Commission's earlier conclusion that "the commentary [is] much like legislative history or other legal material that helps determine the

intent of a drafter," the Supreme Court has declared that Commentary "explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice." Stinson, 508 U.S. at 44-47. The Court held that Commentary is binding on sentencing courts "unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Id. at 38.

The treatment of Commentary as binding on sentencing courts absent a violation of the Constitution and federal statutes is unusual in comparison to the weight afforded to guidelines, policy statements and opinion letters of other agencies. See, e.g., United States v. Mead Corp., 533 U.S. 218 (2001) (Custom Service's "ruling letter" not entitled to deference under Chevron v. Nat'l Resources Defense Council, 467 U.S. 837, 844 (1984)); Christensen v. Harris County, 529 U.S. 576, 587 (2000) (noting that agency interpretations in opinion letters, policy statements, agency manuals, and enforcement guidelines do not warrant Chevron-style deference, but are "entitled to respect to the extent they are persuasive."); Reno v. Koray, 515 U.S. 50, 61 (1995) (internal agency guideline not subject to the rigors of the APA entitled only to "some deference"); EEOC v. Arabian American Oil Co., 499 U.S. 244, 256-258 (1991) (interpretative guidelines of the EEOC providing that Title VII applies to American employers doing business outside of the United States do not receive Chevron deference); Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 157 (1991) (interpretative rules and enforcement guidelines are "not entitled to the same deference as norms that derive from the exercise of the Secretary's delegated lawmaking powers"); General Elec. Co. v. Gilbert, 429 U.S. 125, 140-146 (1976) (refusing to follow EEOC Guidelines interpreting Title VII to require benefits to be provided for disabilities resulting from pregnancy on the same terms and conditions as provided for other temporary disabilities); Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (opinion

48

letters "entitled to respect" only to the extent that those interpretations have the "power to persuade").

Section 994(p) of title 28 requires the Sentencing Commission to submit any proposed permanent Guidelines to Congress. 28 U.S.C. § 994(p). The new Guideline becomes effective six months after its submission, thus affording Congress an opportunity to reject or modify it. <u>Id.</u> Commentary, however, is not automatically reviewed by Congress. <u>Id.</u> at 46. As the Supreme Court observed in <u>Stinson</u>:

> Congress necessarily contemplated that the Commission would periodically review the work of the courts, and would make whatever clarifying revisions to the Guidelines conflicting judicial decisions might suggest. Although amendments to guidelines provisions are one method of incorporating revisions, another method open to the Commission is amendment of the commentary, if the guideline which the commentary interprets will bear the construction. <u>Amended commentary is binding on the federal courts even though it is not reviewed by Congress, and prior judicial constructions of a particular guideline cannot prevent the Commission from adopting a conflicting interpretation that satisfies the standard we set forth today.</u>

<u>Id.</u> at 45 (emphasis added; citations and quotation marks omitted). By the Sentencing Commission's own decision, amendment or addition of Commentary is not subject to the notice and comment procedures that the Commission must follow when promulgating or amending Guidelines. <u>See</u> Rules of Practice and Procedure, 62 Fed. Reg. 38598 ("The Commission may promulgate commentary and policy statements, and amendments thereto, without regard to the provisions of 28 U.S.C. 994(x).").

An unpublished opinion of the Court of Appeals for the Eleventh Circuit discussed the lack of transparency created by the Commentary to the Guidelines:

> <u>Stinson</u> . . . established that the Commission, by means of writing commentary to the Guidelines, possesses the power to, in effect, make law without the participation of Congress—that would overrule (perhaps even retroactively) the law of the federal circuits as announced by the highest courts of those circuits. The authority granted to the Commission by Congress is now

> coupled with the <u>Stinson</u> conclusion that, <u>amended commentary is binding on the</u>
> <u>federal courts even though it is not reviewed by Congress</u>, and prior judicial
> constructions of a particular guideline cannot prevent the Commission from
> adopting a conflicting interpretation that satisfies the standard we set forth today.
> <u>Stinson</u> thus provides a mechanism to circumvent both the judicial hierarchy and
> Congress.

United States v. McLellan, No. 93-8117 (11th Cir. June 30, 1994), slip op. at 4 (emphasis added)

(quoted in Ira Bloom, The Aftermath of Mistretta: The Demonstrated Incompatibility of the

United States Sentencing Commission and Separation of Powers Principles, 24 Am. J. Crim. L.

1, 23-24 (1996)); see also John P. Jurden, United States v. Muschik: An Administrative Law

Critique of the Federal Sentencing Guidelines' Ability to Override Judicial Statutory

Interpretations, 80 Minn. L. Rev. 469 (1995); Todd L. Newton, Note, Commentary That Binds:

The Increased Power of the United States Sentencing Commission in Light of Stinson v. United

States [ ], 17 U. Ark. Little Rock L.J. 155 (1994); Jeffrey H. Knox, Legislating Through the Use

of Commentary: The Commission's Interpretation of § 944(h) of the Sentencing Reform Act, 88

J. Crim. L. & Criminology 906 (1998).

Judge John Gleeson has documented the Commission's inappropriate utilization of

amendments to one Guideline Commentary. Initially it had allowed prosecutors to engage in

sentence bargains for "justifiable reasons." See John Gleeson, The Sentencing Commission and

Prosecutorial Discretion: The Role of the Courts in Sentencing Bargains, 36 Hofstra L. Rev. 639,

644-47 (2008). The Commission later amended the Commentary to define " 'justifiable reasons'

[as] . . . those extraordinary circumstances that would support a departure under the Guidelines'

narrow departure authority," thereby substantively changing the Guideline by evading the notice

and comment procedure and congressional review. Id. at 644. Judge Gleeson described the

process used by the Commission and its perverse effects:

At the same time that it restricted judicial discretion at sentencing, the Commission took pains to assure judges, prosecutors, and defense attorneys that it was not touching plea bargaining practices, at least not yet. Rather, the Guidelines would establish a clear and definite sentence expectation so the plea bargaining prosecutor and defense counsel would "no longer work in the dark." In policy statement § 6B1.2 and its commentary the Commission said that sentence bargains could be accepted as long as the specified sentence departed from the applicable Guidelines range for "justifiable reasons" and did "not undermine the basic purposes of sentencing."

Those are standards a district judge can work with. The phrase "justifiable reasons" can easily accommodate all of the real-world factors that cause prosecutors and defense counsel to strike sentence bargains. And since those concerns had long been considered legitimate reasons for courts to accept sentence bargains, it was easy to conclude that accepting these agreements did not "undermine" any purposes of sentencing, let alone the "basic" ones. So the initial Guidelines left plea bargaining in general—and sentence bargaining in particular—as the Commission had found it.

Then, in 1989, just two years into the Guidelines era, the Sentencing Commission produced Amendment 295 to the Guidelines . . . . The amendment is easily described. The Commission did not touch the text of § 6B1.2, which still authorizes judges to accept sentence bargains so long as there are "justifiable reasons" for doing so. But it slipped into the commentary language that defined that phrase. The definition limited "justifiable reasons" to those extraordinary circumstances that would support a departure under the Guidelines' narrow departure authority.

Though the Commission billed the 1989 amendment as a mere "clarification" of the existing commentary, nothing could have been further from the truth. By prohibiting judges from accepting a bargain for a sentence that could not be reached through the departure power, the Commission actually made a very important normative decision: It subjected disparities produced by prosecutors through sentence bargains to the same tight regulation the Guidelines had imposed upon disparities produced by judges. A prosecutor's concern about losing at trial is not an authorized departure ground. Neither is concern for the victim, sympathy for a defendant, or a desire to free up resources for another investigation. . . . [T]hese and other reasons had always been considered legitimate bases for a prosecutor, subject to court approval that was almost always given, to negotiate a sentence bargain. For reasons sufficient to the Commission but expressed nowhere, the 1989 amendment tried to outlaw these agreements by requiring judges to reject them. . . . The intent to snuff out sentence bargains in almost all circumstances was clear. Indeed, a law review article authored by the Commission's Chair and General Counsel shortly after the 1989 amendment suggested that the real reason for the "clarification" was to do just that.

> ... This is not the way sentencing policy should be made. ... [A]ll ... facets of the issue cannot be considered where important policy changes are made by stealth, disguised as "clarifications."

Id. at 643-46 (footnotes omitted).

The two-level enhancement for a stolen gun is mandated by a Guideline. See U.S.S.G. § 2K2.1(b)(4). The Guideline does not state whether the defendant needs to be aware that the gun was stolen. That is provided in the Commentary. See U.S.S.G. § 2K2.1(b)(4) cmt. n.8(B). The predecessor section of U.S.S.G. § 2K2.1(b)(4), section 2K2.3(b)(2)(C), authorized a one-level enhancement "[i]f the defendant knew or had reason to believe that the firearm was stolen . . . ." U.S.S.G. § 2K2.3(b)(2)(C) (Nov. 1987). This earlier version of the Commentary was submitted to Congress as part of the first Guidelines Manual. Effective November 1, 1989, some provisions of section 2K2.3 were consolidated into section 2K2.1. See U.S.S.G. App. C, amdt. 189. At that time, the enhancement for stolen firearms and firearms with altered or obliterated serial numbers was redesignated as section 2K2.1(b)(4); the amended Guideline authorized a two-level increase and eliminated the scienter requirement. See U.S.S.G. § 2K2.1(b)(4) (Nov. 1989).

By this process, the Commission substantively altered the Commentary and avoided automatic congressional review. The new Commentary to the Guideline achieves the same effect as a statute prohibiting possession of a stolen gun. See 18 U.S.C. § 944(j). The difference between the Commentary and the statute is that the former holds the defendant strictly liable (regardless of the fact that the defendant did not know or had reason to believe that the gun was stolen) and the latter requires the defendant to know or have reasonable cause to believe that the gun was stolen. Commentary, not reviewed by Congress, nor subject to the full scrutiny under the APA, promulgated by an agency within the judicial branch of the government, holds a person

52

strictly liable in a situation where the elected branch of our government requires that a defendant have knowledge. See infra section IV.D.2.b.i.

c.     Departure from the Guidelines

Departure from the Sentencing Guidelines appears to provide one possible mechanism of judicial review over the Sentencing Commission in those cases when a mitigating or aggravating circumstance "of a kind, or to a degree" was "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." See 28 U.S.C. § 3553(b)(1); see also Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2008, Pub. L. 108-21, § 401(d)(1), 117 Stat. 670 (adding a de novo standard of review for departures). In determining whether to depart, the court is directed to consider only "the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." Id. In those circumstances in which the Sentencing Commission has adequately taken all circumstances into consideration—even though it has arbitrarily and capriciously mandated an enhancement as in the instant case—departure is not permissible. See, e.g., United States v. Canales, 91 F.3d 363, 369 (2d Cir. 1996) (departure not warranted despite fact that Commission may have inadequately considered racial impact resulting from the crack-cocaine disparity).

2.     *Commentary to U.S.S.G. § 2K2.1(b)(4) Violating Enabling Statute*

a.     Standard of Review

The question of what standard of review applies in determining whether a sentencing Guideline violates sections 991 and 994 of title 28 was largely left unresolved pre-Booker. See LaBonte, 520 U.S. 751. It is not solved post-Booker. The problem is especially intricate when it involves Commentary to the Guidelines (as in the instant case) which binds a sentencing court, is

not presented to Congress for review, is not subjected to the rigors of the APA, and is unaccompanied by any rationale or justification. Id.

The Supreme Court's decision in Chevron sets forth the standard in reviewing an agency's construction of a statute which it administers. See Chevron, 467 U.S. 837 (1984). Chevron requires a two-step inquiry to review an agency's statutory compliance. (1) If the statute is unambiguous, the court must reject the agency's statutory interpretation if it is inconsistent with express congressional intent. Id. at 842-43. (2) If the statute is ambiguous, the court must give effect to the agency's interpretation if it "based on a permissible construction of the statute." Id. at 843 (emphasis added). A "permissible" construction can be different from one that the court would have determined de novo. Id. at 843 n.11. The Court explained that by leaving a statute delegating authority to an agency ambiguous, Congress intends for the agency to resolve the ambiguity in light of its expertise in the area:

> The power of an administrative agency to administer a congressionally created program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

Id. at 843-44 (quotation marks, citations and footnotes omitted); see also Smiley v. Citibank (South Dakota) N.A., 517 U.S. 735, 740-41 (1996) ("We accord deference to agencies under Chevron, not because of a presumption that they drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors; but rather because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency,

understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.").

Chevron has been the subject of criticism, praise and exceptions. See, e.g., Cass R. Sunstein, Law and Administration After Chevron, 90 Colum. L. Rev. 2071, 2074 (1990) ("The Chevron principle . . . is quite jarring to those who recall the suggestion, found in Marbury v. Madison and repeated time and again in American public law, that it is for judges, and no one else, to 'say what the law is.' ") (footnote omitted); EEOC v. Arabian –American Oil Co., 499 U.S. 244, 260 (1991) (Scalia, J., Concurring) ("But deference is not abdication . . . ."); Joseph W. Luby, Reining in the "Junior Varsity Congress": A Call for Meaningful Judicial Review of the Federal Sentencing Guidelines, 77 Wash. U.L.Q. 1199, 1224-27 & fns. 188-217 (1999) (collecting law review articles and cases). But its standard remains regnant. See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187, 188 (2006) ("Over twenty years after its birth, the U.S. Supreme Court's decision in Chevron shows no sign of losing its influence. On the contrary, the decision has become foundational, even a quasi-constitutional text—the undisputed starting point for any assessment of the allocation of authority between federal courts and administrative agencies.") (footnote omitted).

The Supreme Court's decision in LaBonte supports the rule of no deference in review of the Sentencing Commission's constructions of unambiguous federal statutes. LaBonte, 520 U.S. 762 n.6. It made clear that the Commission lacked carte blanche to ignore a congressional policy or fundamental law. At issue in LaBonte was the congressional directive in 28 U.S.C. § 994(h) and the Sentencing Commission's means of implementing it with the Career Offender Guideline.

Section 994(h) directed the Commission to "specify a sentence to a term of imprisonment at or near the maximum term authorized" for a defendant who is at least eighteen years old and:

> (1) has been convicted of a [violent crime or drug-related] felony . . . . and

> (2) has previously been convicted of two or more prior felonies, each of which is [a violent crime or drug-related] . . . .

28 U.S.C. § 994(h).

The Career Offender Guideline which sought to give effect to section 994(h) created a table of enhanced total offense levels. A defendant who qualifies for "career offender status" was automatically placed in criminal history category VI, the highest available under the Guidelines. LaBonte, 520 U.S. at 753. The table assigned the appropriate offense level based on "offense statutory maximum" which was defined by the Commentary to the Guideline as "the maximum term of imprisonment authorized for the offense of conviction." Id. at 754 (quoting U.S.S.G. App. C, amdt. 267) (adding U.S.S.G. § 4B1.1, cmt. n.2)). The Commentary did not resolve the issue of whether the maximum term was the basic statutory maximum or an enhanced maximum penalty for career offenders convicted of the same offense. Id. Courts of appeals concluded that the enhanced statutory maximum term applied. Id. The Commission then amended the "commentary to preclude consideration of statutory maximum enhancements in calculating the 'offense statutory maximum' " under the Career Offender Guideline. Id.

The Supreme Court rejected the Sentencing Commission's interpretation of section 994(h). It ruled that although the Commission is afforded "significant discretion in formulating the guidelines . . . , it must bow to the specific directives of Congress." Id. at 757 (emphasis added). The Court concluded that the Commission's interpretation violated section 994(h)'s "plain meaning" that the Guidelines specify a term of imprisonment at or near the "maximum term authorized" for certain categories of offenders:

Congress has expressly provided enhanced maximum penalties for certain categories of repeat offenders in an effort to treat them more harshly than other offenders. . . . We are unwilling to read § 994(h) as essentially rendering meaningless entire provisions of other statutes to which it expressly refers. . . . Congress surely did not establish enhanced penalties for repeat offenders only to have the Commission render them a virtual nullity. . . . . Whatever latitude § 994(h) affords the Commission in deciding how close a sentence must come to the maximum to be "near" it, the statute does not license the Commission to select as the relevant "maximum term" a sentence that is different from the congressionally authorized maximum term.

Id. at 760-61.

The Court refused to apply <u>Chevron</u> deference to the Commission's interpretation of section 994(h) because the statute was, it held, unambiguous and the Commission's interpretation was inconsistent with its plain meaning. <u>Id.</u> at 761 n.6 ("Inasmuch as we find the statute at issue here unambiguous, we need not decide whether the Commission is owed deference under <u>Chevron</u>"). But see <u>id.</u> at 763 (Breyer, J., dissenting) ("In my view . . . the words 'maximum term authorized' are ambiguous. . . . In light of the statutory ambiguity, we should defer to the Commission's views about what Guideline the statute permits it to write; and we should uphold the Guideline the Commission has written because it 'is based on a permissible construction of the statute.' " (citing <u>Chevron</u>, 467 U.S. at 843)).

The Court rejected the Commission's argument that the amended commentary serves the broad purposes of the Sentencing Reform Act to reduce unwarranted sentencing disparity by mitigating "variations in exercise of prosecutorial discretion in seeking enhanced penalties based on prior convictions." <u>Id.</u> at 761-62 (quoting U.S.S.G. App. C., amdt. 506); <u>see also</u> 28 U.S.C. § 994(f) (directing the Commission to reduce unwarranted sentencing disparities). The Court directed the Commission to "bow to the specific directives of Congress" and repudiated its attempt to pick and choose which statutory commands to follow. <u>Id.</u> at 757-61.

Prior to LaBonte, several courts of appeals applied Chevron deference or some other deferring standard of review when determining the Sentencing Commission's construction of federal statutes. See, e.g., United States v. Lee, 887 F.2d 888, 890 (8th Cir. 1989) ("In reviewing a challenge to [the Sentencing Commission's] . . . construction of a statute, the agency's construction of the statute must be upheld if it is 'sufficiently reasonable' in responding to congressional mandate."); United States v. LaBonte, 70 F.3d 1396, 1404 (1st Cir. 1995), rev'd, 520 U.S. 751 (1997) ("[W]e believe that Chevron deference is the proper criterion for determining whether a guideline . . . contravenes a statute."); United States v. Novey, 78 F.3d 1483, 1486 n.2 (10th Cir. 1996) ("There appears to be some debate as to whether Stinson implies this level of deference whenever judicial review of the commentary is undertaken, or whether the appropriate standard when commentary is being reviewed for consistency with a statute is supplied by Chevron. We need not delve into such fine distinctions here . . . .") (citations omitted); United States v. Consuegra, 22 F.3d 788, 789 (8th Cir. 1994) ("[W]e must uphold the Commission's interpretation . . . if [it] is 'sufficiently reasonable' in light of the congressional directive."); United States v. Marion, 977 F.2d 1284, 1289 (8th Cir. 1992) ("If the guideline is sufficiently reasonable in light of Congress' directive, we must uphold the guideline."); supra section IV.B. (collecting cases that applied rational basis standard of review for the two-level strict liability enhancement for a stolen gun); see also generally Ronald F. Wright, Sentencers, Bureaucrats, and the Administrative Law Perspective on the Federal Sentencing Commission, 79 Calif. L. Rev. 1, 51-55 (1991).

LaBonte supports the conclusion that the Sentencing Commission is owed no deference when it interprets unambiguous federal statutes. See also United States v. Butler, 207 F.3d 839, 850 (6th Cir. 2000) (applying LaBonte and concluding "[w]e can not conceive of a clearer

example than that presented here where the Commission has so flatly ignored a clear Congressional directive."); <u>United States v. Price</u>, 990 F.2d 1367, 1369 (D.C. Cir. 1993) (explaining that whatever level of deference is owed to the Commission, "that deference does not extend to interpretations in conflict with a clear determination of Congress.").

Several considerations suggest that the Commission should be entitled to less deference than is afforded to other agencies when interpreting an ambiguous statute or Commentary to the Guidelines. The Commission, rather than regulating an area like other specialized agencies which require special expertise, interprets substantive criminal law with constitutional implications, <u>see</u> <u>infra</u> section IV.D.2.b.ii., and regulates sentencing of criminal defendants which is "historically within the discretion of judges." <u>United States v. Galloway</u>, 976 F.2d 414, 434 (8th Cir. 1992) (en banc) (Beam, J., dissenting) ("Since three of the seven members of the Commission are federal judges . . . , it is mere conjecture to assume the Commission has any expertise not found in the members of the judiciary who review its actions. Additionally, the separation of powers concern which militates in favor of deference to the compromise between Congress and the executive in the usual regulatory regime is attenuated when, as here, the body responsible for promulgating the regulations is also within the same branch of government."); <u>see also</u> Joseph W. Luby, <u>Reining in the "Junior Varsity Congress": A Call for Meaningful Judicial Review of the Federal Sentencing Guidelines</u>, 77 Wash. U.L.Q. 1199, 1227-29 nn.219-25 (1999). Commentary to the Sentencing Guidelines should be entitled to less deference in light of the fact that its promulgation and amendment is not subject to the notice and comment provision of the APA nor presented automatically to Congress for review. <u>See</u> <u>supra</u> section IV.D.1.b. It is entitled to no deference if it violates the Constitution or a federal statute. <u>Stinson</u>, 508 U.S. at 37-38.

b.      Enhancement Violates Requirement of Knowledge that Firearm was Stolen

Commentary to the two-level enhancement for a stolen gun, see U.S.S.G. § 2K2.1 cmt.

n.8(B), holding the defendant strictly liable would be invalid under Chevron deference, non-

Chevron deference and the APA's arbitrary and capricious standard. Because the rule of lenity is

only available when a statute is ambiguous, it will not save U.S.S.G. § 2K2.1(b)(4). See Polizzi,

549 F. Supp. 2d at 377-78 (detailing the application of the rule of lenity). As discussed supra

section IV.D.2., section 994 of title 28 directs the Sentencing Commission to promulgate

Sentencing Guidelines and general Policy Statements "consistent with all pertinent provisions of

any Federal statute." 28 U.S.C. § 994(a) (emphasis added). Commentary as well as Guidelines

and Policy Statements must be consistent with all pertinent federal statutes. See United States v.

Holloway, 991 F.2d 370, 373 (7th Cir. 1993) ("[T]he Sentencing Guidelines cannot trump the

edicts of the federal criminal statutes."); id. at 373 n.5 ("Indeed, statutory maximum and

minimum limits provide the outer bounds for sentences, even when a sentence calculated under

the Guidelines is contrary to those specified amounts."); United States v. Washington, 933 F.

Supp. 1003, 1006 (D.D.C. 1996) ("The Commission does not . . . have the authority to override

or to amend a statute."); see also Stinson, 508 U.S. at 37-38 (holding that Commentary to the

Guidelines cannot be applied if it violates the "Constitution or a federal statute.") (emphasis

added).

i.      Statute Requiring Mens Rea

Congressional concern with stolen firearms resulted in the 1963 enactment of wide-

ranging legislation criminalizing transportation, receipt, concealment, storing, bartering, selling

and disposing of stolen firearms. See Omnibus Crime Control and Safe Streets Act of 1968,

Pub. L. No. 90-351, § 902 (enacting Chapter 44 of title 18). The Court of Appeals for the Fifth

Circuit has pointed out that amendments to section 922(j) evince Congress's commitment to eradicate traffic in stolen firearms:

> In addition to the jurisdictional nexus found in the language of § 922(j), congressional findings support the conclusion that possession of stolen firearms "substantially affects interstate commerce." . . . Section 922 has been amended twice since its inception, and both amendments have broadened the scope and strengthened the role of the federal government in the continuing fight against illicit trafficking in stolen firearms. The provision was first expanded in 1990 to reach firearms "shipped or transported in" interstate commerce. In its report on proposed changes to § 922, the Judiciary Committee of the House of Representatives explained that the change in § 922(j) was designed to "expand Federal jurisdiction to permit prosecutions for transactions involving stolen firearms where the firearms have already moved in interstate or foreign commerce." Again, in 1994, § 922(j) was amended to specify that the firearm could have traveled in interstate commerce "either before or after it was stolen." Although Congress made no findings regarding this amendment, we perceive the clear purpose to have been to extend further its cognizance over any stolen firearm.
>
> The expansion of federal jurisdiction over stolen firearms demonstrates Congress's commitment to eradicating the traffic in stolen firearms. . . .

United States v. Luna, 165 F.3d 316, 321 (5th Cir. 1999) (footnoted omitted).

Section 922(j) of title 18 criminalizes those who "receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm . . . knowing or having reasonable cause to believe that the firearm or ammunition was stolen." 18 U.S.C. 922(j) (emphasis added); see also 18 U.S.C. 922(i) (criminalizing transportation of "any stolen firearm . . . knowing or having reasonable cause to believe that the firearm . . . was stolen.") (emphasis added). An earlier version of section 922(j) did not criminalize mere possession. See United States v. Honaker, 5 F.3d 160, 162 (6th Cir. 1993) (noting the earlier version of section 922(j): "It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm . . . ."). The statute was amended in 1994; "possess" was inserted after "receive." See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 110514; United States v. Sanders, 3 F. Supp.

2d 554, 561 n.6 (M.D. Pa. 1998) ("The word 'possess' was inserted after 'receive' in the . . .

[1994] amendment."); see also United States v. Laroche, 170 Fed. App'x 124, 126 (11th Cir.

2006) (recognizing that "the legislative history for the statute is complex."); United States v.

Sanders, 165 F.3d 248, 252 (3d Cir. 1999) (detailing the legislative history of section 922(j) and

finding that "[i]t is clear from the legislative history that this amendment was intended to expand

the jurisdiction of federal courts by broadening the scope of the interstate commerce nexus.").

    Federal statutes related to firearms almost uniformly require a mens rea component. See,

e.g., 18 U.S.C. § 922(b)(1) ("knows or has reasonable cause to believe") (emphasis added); 18

U.S.C. § 922(b)(2) ("knows or has reasonable cause to believe") (emphasis added); 18 U.S.C.

922(b)(2) ("knows or has reasonable cause to believe") (emphasis added); 18 U.S.C. § 922(d)

("knowing or having reasonable cause to believe") (emphasis added); 18 U.S.C. § 922(f) ("with

knowledge or reasonable cause to believe") (emphasis added); 18 U.S.C. § 922(h)

("knowledge") (emphasis added); 18 U.S.C. § 922(i) ("knowing or having reasonable cause to

believe") (emphasis added); 18 U.S.C. § 922(j) ("knowing or having reasonable cause to

believe") (emphasis added); 18 U.S.C. § 922(k) ("knowingly") (emphasis added); 18 U.S.C. §

922(l) ("knowingly") (emphasis added); 18 U.S.C. § 922(m) ("knowingly") (emphasis added).

Courts have employed the rule of lenity to read in a mens rea for those firearms-related statutes

which do not have one. See, e.g., Staples v. United States, 511 U.S. 600, 605 (1994) ("[The

statute] . . . is silent concerning the mens rea required for a violation. . . . Nevertheless, silence on

this point by itself does not necessarily suggest that Congress intended to dispense with a

conventional mens rea element, which would require that the defendant know the facts that make

his conduct illegal. On the contrary, we must construe the statute in light of the background

rules of the common law, in which the requirement of some mens rea for a crime is firmly embedded.") (citation omitted).

ii.    Historical Importance and Constitutional Requirement of Mens Rea

Congressional requirements of mens rea in criminal statutes conform to the profound status afforded the concept in Anglo-American history and constitutional jurisprudence. See, e.g., Polizzi, 549 F. Supp. 2d at 349-53; Cordoba-Hincapie, 825 F. Supp. at 489-527. There is no need to rehearse again in detail the origins, modern views, theory, exceptions, constitutional dimensions, Supreme Court and lower court treatment, and applicability of mens rea in the sentencing context set forth at length in Cordoba-Hincapie, 825 F. Supp. at 489-527, and Polizzi, 549 F. Supp. 2d at 349-53. Only a few points need to be reiterated.

Like most common law doctrines preexisting the Constitution and modern statutes, mens rea has been subjected to some limited exceptions. Cordoba-Hincapie, 825 F. Supp. 2d at 496; see also Staples, 511 U.S. at 619-20 ("Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not.") (citation omitted). The exception for public-welfare offenses includes minor violations for "liquor laws, the pure food laws, the anti-narcotics laws, motor vehicle and traffic regulations, sanitary, building and factory laws and the like." Cordoba-Hincapie, 829 F. Supp. 2d at 496 (quoting Francis Bowes Sayre, Public Welfare Offenses, 33 Colum. L. Rev. 55, 78 (1933)); see also id. at 496 ("[I]f punishment of the wrongdoer far outweighs regulation of the social order as a purpose of the law in question, then mens rea is probably required. . . . [I]f the penalty is light, involving a relatively small fine and not including imprisonment, then mens rea probably is not required." (quoting Sayre, supra, at 72)). Strict liability outside the realm of public-welfare offenses is allowed for narrow

categories of crimes such as the crime of "statutory rape." Id. at 497; but see id. ("In defense of mens rea principles, a growing number of states have developed legislative or judge-made defenses applicable in statutory rape cases, usually requiring the defendant to prove a "reasonable" mistake of fact as to the victim's age.") (collecting cases). Liability for a negligent state of mind, often considered an exception to mens rea, is not "an abandonment of the mens rea principle but rather its extension to include blame for the absence of a state of mind that, according to societal norms, the actor should have had." Id. at 500 (citing Herbert L. Packer, Mens Rea and the Supreme Court, 1962 Sup. Ct. Rev. 107, 143-45 (1962)). In the instant case, the penalty is heavy and there was no negligence since the defendant had no reason to believe that the gun he possessed was stolen.

The work of leading authorities on criminal law before and after the adoption of the Constitution and the Supreme Court's and lower federal court's treatment of the mens rea principle form the constitutional baseline for its requirement in criminal laws. Id. at 489-521 (collecting authorities on criminal law, Supreme Court and lower court cases); Bentham, Principles of Penal Law, in 1 The Works of Jeremy Bentham 397-98 (John Bowring ed., 1962); Oliver Wendell Holmes, The Common Law 43-50 (1881); Francis Bowes Sayre, Public Welfare Offenses, 33 Colum. L. Rev. 55, 78 (1933); Jerome Hall, General Principles of Criminal Law 133-34 (2d ed. 1960); Glanville Williams, Criminal Law: The General Part 30 (2d ed. 1961); Herbert L. Packer, Mens Rea and the Supreme Court, 1962 Sup. Ct. Rev. 107, 143-45 (1962).

Caselaw and the historical roots of mens rea pre-dating the Constitution impart a clear message that the concept is constitutionally required by the due process clause because:

> By the time the right to a jury trial and due process was embedded in the first amendments to the Constitution, mens rea constituted a fundamental protection against abuse of criminal sanctions by the state. It is a general rule of law that

guards beliefs deeply held within our traditions of individual freedom, responsibility and duty.

Cordoba-Hincapie, 829 F. Supp. 2d at 495-96; see also id. at 515 ("The legal framework against which the Framers of the United States Constitution operated included a strong commitment to individual blameworthiness as the chief determinant of criminal liability.").

Recent Supreme Court precedent supports the proposition that mens rea is required in possession-related firearms statutes. In Staples, a federal statute criminalized possession of unregistered "machineguns," defined as a weapon that automatically fires more than one shot with a single pull of the trigger. Staples, 511 U.S. at 602. Defendant was convicted of possession of an unregistered machinegun in violation of the statute. Id. at 603. The machinegun was a semiautomatic rifle (a weapon that normally fires one shot with each trigger pull) which had been modified into an automatic firearm, a "machinegun" for the purposes of the statute. Id. The defendant contended that he was unaware of any automatic firing capability. Id. Although the statute did not require the defendant to know that the firearm he possessed was a machinegun, the Supreme Court held that the government must prove that the defendant knew that the firearm had characteristics that brought it within the statutory definition of a machinegun. Id. at 619-20. The Court rejected the argument that the statute fits within the definitions of "public welfare" or "regulatory" offenses and that the presumption favoring mens rea should not apply:

> [T]he fact remains that there is a long tradition of widespread lawful gun ownership by private individuals in this country. . . . Here, the Government essentially suggests that we should interpret the section under the altogether different assumption that "one would hardly be surprised to learn that owning a gun is not an innocent act." That proposition is simply not supported by common experience. Guns in general are not "deleterious devices or products or obnoxious waste materials[ ]" that put their owners on notice that they stand "in responsible relation to a public danger[.]"

65

> . . . [C]riminaliz[ation of] ostensibly innocuous conduct is inapplicable whenever an item is sufficiently dangerous—that is, dangerousness alone should alert an individual to probable regulation and justify treating a statute that regulates the dangerous device as dispensing with mens rea. But that an item is "dangerous," in some general sense, does not necessarily suggest, as the Government seems to assume, that it is not also entirely innocent. Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. . . . [D]espite their potential for harm, guns generally can be owned in perfect innocence.

Id. at 610-11 (citations omitted); see also id. at 613 ("[T]he Government suggests that guns are subject to an array of regulations . . . that put gun owners on notice that they must determine the characteristics of their weapons and comply with all legal requirements. But regulation in itself is not sufficient to place gun ownership in the category of the sale of narcotics . . . . [D]espite the overlay of legal restrictions on gun ownership, we question whether regulations on guns are sufficiently intrusive that they impinge upon the common experience that owning a gun is usually licit and blameless conduct.") (citations and footnotes omitted).

The Court found it unnecessary to rely upon the rule of lenity to reach the result implying mens rea:

> In reaching our conclusion, we find it unnecessary to rely on the rule of lenity, under which an ambiguous criminal statute is to be construed in favor of the accused. That maxim of construction is reserved for cases where, after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute. Here, the background rule of the common law favoring mens rea and the substantial body of precedent we have developed construing statutes that do not specify a mental element provide considerable interpretive tools from which we can seize aid, and they do not leave us with the ultimate impression that [the statute] . . . is grievously ambiguous. Certainly, we have not concluded in the past that statutes silent with respect to mens rea are ambiguous.

Id. at 619 n.17 (quotation marks, citations and alterations in original omitted). It concluded that its "reasoning depends upon a commonsense evaluation of the nature of the particular device or substance Congress has subjected to regulation and the expectations that individuals may

legitimately have in dealing with the regulated items." Id. at 619. Emphasized was the fact that the penalty of imprisonment attached to the criminal statute "suggests that Congress did not intend to eliminate a mens rea requirement for violation of the section." Id.

iii.    Analysis

In the instant case there is a closely related specific and unambiguous statute which requires the government to prove beyond a reasonable doubt that the defendant knew or had reason to know that the firearm he possessed was stolen. See 18 U.S.C. § 922(j). Commentary to U.S.S.G. § 2K2.1(b)(4) cannot ignore this congressional policy and the constitutional implications attached to it. Cf. Staples, 511 U.S. 600 (holding that a defendant must know the characteristics of a prohibited item in order to be punished under the relevant statute); United States v. Lynch, 233 F.3d 1139 (9th Cir. 2000) (knowledge of the intangible characteristics that made an item an archeological resource was required for culpability under the charged statute even when a defendant's actions were not wholly innocent); Cordoba-Hincapie, 825 F. Supp. at 534 (holding that defendant's offense level under the Guidelines must be calculated for the drug the defendant believed he was importing, not the drug actually imported). A previous version of the Commentary which mandated a one-level enhancement for a stolen firearm properly required the defendant to know or have reasonable cause to know that the firearm was stolen. See supra section IV.D.1.b. It is difficult to see deterrence value in punishing aggravating circumstances of which a defendant was not aware since he could not have corrected his conduct in deference to the particular criminal law.

Other considerations supporting the invalidity of U.S.S.G. § 2K2.1 cmt. n.8(B) include research showing that firearm retailers often sell guns to ineligible persons (e.g., convicted felons, non-state residents) and report those guns lost or stolen in order to avoid liability if the

gun is traced back to their establishment by federal and state authorities. See, e.g., Americans

for Gun Safety Foundation, Selling Crime: High Crime Gun Stores Fuel Criminals (A Study of

Gun Stores with Over 200 Crime Gun Traces (1996-2000)) 11 (2004) ("[A]TF developed a

series of trafficking indicators that assist in identifying potentially corrupt firearm dealers. These

indicators include: . . . dealers who frequently report firearms stolen or lost . . ."); see also, e.g.,

City of New York v. A-1 Jewelry & Pawn Shop, Inc., 247 F.R.D. 296, 311-27 (E.D.N.Y. 2007)

(detailing, for purposes of personal jurisdiction analysis, practices of gun retailers causing a

nuisance in New York City); City of New York v. A-1 Jewelry & Pawn, Inc., 501 F. Supp. 2d

369 (E.D.N.Y. 2007) (same); City of New York v. Bob Moates' Sport Shop, Inc., No. 06-CV-

6504, 2008 WL 427964, 2008 U.S. Dist. LEXIS 11699 (E.D.N.Y. Feb. 15. 2008) (same);

Johnson v. Bryco Arms, 304 F. Supp. 2d 383 (E.D.N.Y. 2004) (discussing claims by victim of

gun violence against gun manufacturer, wholesaler, distributor, and retailer ); NAACP v. A.A.

Arms, Inc., No. 99-CV-3999, No. 99-CV-7037, 2003 WL 21242939, 2003 U.S. Dist. LEXIS

8238 (E.D.N.Y. 2003) (claims by an organization against gun manufacturers, wholesalers,

distributors, and retailers); NAACP v. Acusport Corp., Nos. 99-CV-7037, 99-CV-3999, 2000

WL 1789094, 2000 U.S. Dist. LEXIS 17573 (E.D.N.Y. 2000) (same); Hamilton v. Accu-Tek, 32

F. Supp. 2d 47 (E.D.N.Y. 1998) (claims by relatives of gun violence victims against gun

manufacturers and retailers).

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the principal federal

agency charged with regulating the firearms industry, has determined that federal firearms

licensed dealers' ("FFLs") often fail to follow federal laws which requires them to be transparent

and maintain records account for majority of the guns being reported lost or stolen:

> The accuracy of a dealer's inventory is critical to ATF's ability to trace
> crime guns. Pursuant to the Violent Crime Control and Law Enforcement Act of

1994, FFLs are required to report firearms lost and stolen from inventory to the NTC [(ATF's National Tracing Center)] within 48 hours of theft or loss. . . . ATF has no authority to require FFLs to take security measures, but can seek to determine whether firearms reported lost or stolen were accurately reported, or trafficked by the licensee or an employee of the licensee.

In 1998 and 1999, licensees filed reports on over 5,000 incidents, involving 27,287 lost or stolen firearms. These included the following types of incidents:

- Inventory errors, recordkeeping errors, and employee theft, accounting for approximately 39 percent of reported incidents and over 11,000 firearms.

. . . .

Among retail dealers, including pawnbrokers, inspected as part of a special ATF survey in 1998, over half had reported a firearm stolen at some point. Among those that had sold 50 or more firearms the previous year, 10 percent of pawnbrokers and 16 percent of other retail dealers had reported a theft since commencing business. Inventory inconsistencies were discovered at some time in the records of about 45 percent of the pawnbrokers, and nearly 20 percent of the other retail dealers that had sold 50 or more firearms the previous year.

The records of ATF inspections confirm that inventory errors are occurring at a high rate. During inspections conducted in 1999, 21,000 firearms were initially identified as missing from inventory. During the course of their work, inspectors verified firearms in inventory against the record books. This allowed corrections of the records to reduce the number of missing firearms to 5,700. Thus, inspectors corrected a total of over 15,000 inventory errors. Errors in inventory records are a serious problem because a firearm missing from inventory cannot be traced.

Bureau of Alcohol, Tobacco, Firearms and Explosives, Commerce in Firearms in the United States: 2000 27-28 (2000). It is apparent that just because a gun has been traced as stolen does not prove that the gun was actually stolen.

The Sentencing Commission's now-deleted rationale that it requires the enhancement because pre-Sentencing Guidelines sentences tended to be severe if the gun was stolen appears to be inconsistent with the Commission's own amendments to the Guideline and Commentary. See Goodell, 990 F.2d at 500-01 (detailing the amendments to U.S.S.G. §§ 2K2.1(b)(4) and 2K2.1

cmt. n.8(B)); supra sections IV.A. and IV.D.1.b.  Even assuming that the Commission's finding

that pre-Sentencing Guidelines sentences were harsher for stolen gun is based on adequate

research, it is unclear why the Commission increased the enhancement—from the original one-

level to two-levels—without explaining what it had uncovered in its research to support this

increase.  Cf. 28 U.S.C. § 991(b)(1)(c) (directing the Commission to devise Guidelines based on

"advancement in knowledge of human behavior as it relates to the criminal justice process.").

When the Commission required a one-level enhancement, it also required the defendant to know

or have reason to believe that the firearm was stolen.  See supra sections IV.A. and IV.D.1.b.

Different treatment of mens rea for stolen explosives and guns has not been justified.

Section 2K1.3(b)(2) of the Sentencing Guidelines requires a two-level enhancement for

possession of stolen explosives only when "the defendant knew or had reason to believe" the

explosives were stolen.  See U.S.S.G. § 2K1.3(b)(2).  The statutes prohibiting possession of

stolen firearms and explosives are similar and both require the defendant to know or have

reasonable cause to believe that that the prohibited item was stolen.  Compare 18 U.S.C. § 842

(h) ("It shall be unlawful for any person to . . . possess . . . any stolen explosive materials . . .

knowing or having reasonable cause to believe that the explosive materials were stolen.") with

18 U.S.C. § 922(j) ("It shall be unlawful for any person to . . . possess . . . any stolen firearm . . .

knowing or having reasonable cause to believe that the firearm . . . was stolen.") (emphasis

added).  Accordingly, the enhancement for stolen guns should require mens rea similarly to the

enhancement for stolen explosives.

Because the enhancement does not require the defendant to know or have reasonable

cause to believe that the firearm he possessed was stolen, it does not provide deterrence since a

person cannot be deterred from doing what he or she does not know is being done.  See 18

U.S.C. § 3553(a)(2)(B). Because it lacks a requirement of scienter, the enhancement does not reflect the seriousness of the offense, promote respect for the law or provide just punishment for the offense. <u>See</u> 18 U.S.C. § 3553(a)(2)(A).

## V.   Conclusion

The two-level strict liability enhancement for a stolen gun under U.S.S.G. § 2K2.1(b)(4) may not be applied. The defendant did not know and had no reason to know that the gun he possessed was stolen.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: August 4, 2008
      Brooklyn, New York